[No. 19643-3-II.   Division Two.   May 9, 1997.]

JAMES R. ANDERSON, ET AL., *Appellants*, v. PIERCE COUNTY, ET AL., *Respondents*.

*Joanne Henry* and *Vandeberg Johnson & Gandara*, for appellants.

*Brian L. Holtzclaw* and *Cairncross & Hempelmann, P.S.*;
*John W. Ladenburg, Prosecuting Attorney for Pierce
County,* and *Eileen M. McKain, Deputy*; and *John L. Hendrickson* and *Foster Pepper & Shefelman*, for respondents.

HUNT, J. — The City of Buckley and the Buckley
Plateau Coalition appeal Pierce County's issuance of a
Mitigated Determination of Non-Significance (MDNS) and
a Conditional Use Permit to RPW Industries, Inc. Buckley
contends that (1) the Hearing Examiner's decision to
uphold the MDNS was "clearly erroneous," and (2) the
Hearing Examiner erred in finding no violation of an
Urban Area Agreement between Pierce County and the
City of Buckley. RPW Industries and Pierce County
contend that (1) Buckley does not have standing to challenge the MDNS, and (2) they are entitled to reasonable
attorney fees and costs under the Regulatory Reform Act,
RCW 4.84.370. We affirm the decisions of the Hearing
Examiner and deny the requests for attorney fees under
RCW 4.84.370.

## FACTS

In 1988, Pierce County and the City of Buckley entered
into an Urban Area Agreement (UAA), County Ordinance
No. 88-187, in order to plan for anticipated growth. The
purpose of the UAA was to "plan for and regulate uses of
land and the environmental impacts arising therefrom
within their jurisdictions, and [to] consider the impacts of
governmental actions upon adjacent jurisdictions . . . ."[1]

---

[1]An unincorporated area outside Buckley city limits was designated the
"Buckley Urban Area." It appears that both Buckley and Pierce County anticipate eventual annexation to Buckley of portions of this unincorporated area.

Under the UAA, Buckley reserved the right to review land use regulations, proposals, hearings, and decisions before finalization by Pierce County. Pierce County agreed to provide Buckley with copies of permit requests and accompanying documents submitted in accordance with the State Environmental Policy Act (SEPA). RCW 43.21C.010-.910. The UAA also required Buckley to notify Pierce County in writing within 15 days if any proposed action was inconsistent with Buckley's plans or development strategies. The County agreed to "consider the City's response prior to taking any action on the application" but retained final authority for all decisions.

In November 1990, RPW Industries, Inc. (RPW) submitted a permit application to construct a soil bio-remediation facility (RPW Project) on eight acres of a 33-acre parcel at the corner of SR-410 and 254th Avenue East in unincorporated Pierce County, between Buckley and Bonney Lake. The RPW Project would use naturally-occurring bacteria to break down petroleum hydrocarbons in contaminated soils (PCS). The RPW Project would not be used to treat any soils containing hazardous wastes.

The Pierce County Department of Planning and Land Services (PALS) classified the RPW Project as a "Waste Recycling Facility," which required a Conditional Use Permit (CUP). Along with the CUP application, RPW submitted an Environmental Checklist (checklist) as prescribed by SEPA. The CUP application and the checklist were reviewed by PALS, several state and local agencies, and the City of Bonney Lake. PALS was initially unaware of the UAA because it did not have a copy of the UAA or a map of the Buckley Urban Area. Consequently, PALS did not send copies of the RPW Project CUP application or the checklist to Buckley at the outset of the review process.

PALS received numerous comments from state and local agencies concerning several significant adverse environmental impacts that were not addressed in the checklist. PALS then informed RPW that the RPW Proj-

ect would likely cause significant adverse environmental impacts, and that PALS planned to issue a threshold Determination of Significance (DS), which would require RPW to prepare an Environmental Impact Statement (EIS).

RPW and PALS then began a series of intensive negotiations to design measures to mitigate the RPW Project's significant adverse environmental impacts so that a Mitigated Determination of Non-Significance (MDNS) could be issued and an EIS would not be required. Over the next 12 to 18 months, RPW and PALS accumulated volumes of environmental studies and evaluations, which were compiled in a planning department file.

In March 1992, Kathy Sandor, the Mayor of Buckley (Mayor), contacted PALS, expressing displeasure with the lack of notice provided to Buckley, as well as an alleged lack of in-depth review of the RPW Project. The Mayor requested that PALS issue a DS for the RPW Project and require preparation of an EIS.

On April 9, 1992, Debora Hyde, the Director of PALS (Director), apologized to the Mayor for not having previously provided Buckley with notice of the RPW Project application, stating that the failure was an unfortunate oversight. The Director provided Buckley with documents related to environmental review of the RPW Project proposal and stated that:

> [T]his department is close to issuing a . . . MDNS for this proposal. This MDNS will carry approximately 54 mitigation measures aimed at protecting wetlands, wildlife, surface and ground water quality, air, noise, odor, and traffic impacts . . .
>
> . . . We hope that sending this material at this time will provide you with additional time to review the proposal before the MDNS is issued.

The Director assured the Mayor that the MDNS mitigation measures would protect surrounding land uses from the impacts of the RPW Project. The Director promised to send a copy of the MDNS to Buckley as soon as it was is-

sued, noting that a 15-day comment period would follow its issuance. Buckley submitted no comments to Pierce County before the MDNS was issued.

Seven weeks later, on May 28, 1992, PALS issued a MDNS for the RPW Project. The MDNS imposed 54 mitigating conditions on the RPW Project in order to address seven primary areas of significant environmental impact.[2] The MDNS was later amended and reissued with minor revisions on July 17, 1992.

Buckley appealed the issuance of the MDNS to the local Pierce County Hearing Examiner. The Hearing Examiner conducted extensive public hearings, during which over 60 exhibits were admitted, nearly 50 witnesses testified, and numerous experts and professionals provided scientific analysis. The Hearing Examiner found that the proposed RPW Project, as mitigated by the 54 conditions, would cause only moderate environmental impacts, such that an EIS was not required. The Hearing Examiner gave "substantial weight" to PALS' election of the MDNS process, instead of the DS/EIS process, and concluded that the issuance of the MDNS was not "clearly erroneous."[3]

Buckley appealed the Hearing Examiner's decision to the Pierce County Council. The Council remanded the

---

[2]While the 54 mitigating conditions are too lengthy to be listed in this opinion, they provided, for example, that RPW must:

(1) Submit a detailed final mitigation plan which would provide extensive buffers consisting of native species of trees and bushes to mitigate the loss of wetland areas and to mitigate the impacts of traffic, noise, light, glare, and movement from the RPW Project;

(2) Treat all stormwater runoff with approved bio-filtration systems and prevent any runoff from entering adjacent wetland areas;

(3) Comply with all applicable regulations of the Puget Sound Air Pollution Control Agency which may require implementation of the Best Available Control Technology to control odor, air, and noise impacts;

(4) Install and maintain leak detection and protective liner systems under the entire RPW Project area, to be approved by the Tacoma-Pierce County Health Department, to prevent groundwater and surface water contamination.

[3]The Hearing Examiner stated, however, that even though the decision to utilize the MDNS process was not "clearly erroneous," he personally disagreed with the decision not to require an EIS, which would have afforded greater public involvement.

case to the Hearing Examiner to determine whether Pierce County had complied with the UAA.

On remand, the Hearing Examiner ruled that under the UAA, Pierce County was required to provide Buckley with the RPW Project CUP application and checklist "within a short time" after having received them. The Hearing Examiner determined that Pierce County's failure to give Buckley early notice of the RPW Project application was remedied on April 8, 1992, when the County provided Buckley with the necessary environmental information and an opportunity to contribute to the MDNS process. The Hearing Examiner thus concluded that Pierce County had substantially complied with its obligations under the UAA.

Buckley again appealed the Hearing Examiner's decision to the Pierce County Council. The Council deadlocked three to three, and because there was no majority, the decision of the Hearing Examiner was affirmed.

Buckley then obtained a writ of review from Pierce County Superior Court pursuant to RCW 7.16.010-.370. After a hearing, the trial court affirmed the Hearing Examiner's decision, holding that: (1) The decision to issue an MDNS was not "clearly erroneous;" (2) the RPW Project, as mitigated under the MDNS, would not have a significant adverse environmental impact; and (3) Pierce County did not violate the UAA.[4]

Buckley timely appealed the decision of the trial court. Pierce County now argues that the Buckley Plateau Coalition lacked standing to challenge the MDNS. Pierce County and RPW also request reasonable attorney fees and costs under the newly enacted Regulatory Reform Act, RCW 4.84.370.

---

[4]The trial court indicated that, in her personal opinion, an EIS may have been appropriate for the RPW Project in order to facilitate public comment and public access to information.

## ANALYSIS

### I. Standing to Challenge the MDNS.

■ Any "person aggrieved" by a SEPA determination may obtain judicial review. RCW 43.21C.075(4). The term "person aggrieved" has been interpreted to include anyone with standing to sue under existing law. *Trepanier v. City of Everett*, 64 Wn. App. 380, 382, 824 P.2d 524 (1992). Washington courts apply a two-part test for determining whether a person or entity has standing to challenge a SEPA determination: (1) The interest that the party is seeking to protect must be "arguably within the zone of interests to be protected or regulated" by SEPA; and (2) the party must allege an "injury in fact," i.e., that he or she will be "specifically and perceptibly harmed" by the proposed action.[5] *Trepanier*, 64 Wn. App. at 382 (citing *Save a Valuable Env't v. City of Bothell*, 89 Wn.2d 862, 886, 576 P.2d 401 (1978) (quoting *Association of Data Processing Serv. Orgs., Inc. v. Camp*, 397 U.S. 150, 153, 90 S. Ct. 827, 829, 25 L. Ed. 2d 184 (1970))).

In order to show "injury in fact," the Buckley Plateau Coalition must present testimony or affidavits indicating that it will be adversely affected by Pierce County's decision to issue the MDNS and not to require an EIS. *Trepanier*, 64 Wn. App. at 383. If Buckley's alleged injury is merely conjectural or hypothetical, then there can be no standing. *Trepanier*, 64 Wn. App. at 383 (citing *United States v. SCRAP*, 412 U.S. 669, 688-89, 93 S. Ct. 2405, 37 L. Ed. 2d 254 (1973)).

Pierce County contends that the Buckley Plateau Coalition has not alleged a sufficient "injury in fact," but rather has presented only community displeasure and hypothetical injury to support its claim, which were insufficient to confer standing. *See CORE v. City of Olympia*, 33 Wn.

---

[5]Pierce County does not argue that the City of Buckley lacks standing.

App. 677, 683-84, 657 P.2d 790 (1983) (a bald assertion of injury without supporting evidentiary facts is insufficient to support standing).

The Chairman of the Buckley Plateau Coalition testified before the Hearing Examiner that he owns 60 acres of property immediately adjacent to the RPW Project site which he alleges would be adversely impacted by the RPW Project. He also contended that the mitigation measures proposed in the MDNS were insufficient to control storm-water runoff which would damage his adjoining property. We agree with the trial court that the Buckley Plateau Coalition adequately alleged a specific "injury in fact" within the "zone of interests" to be protected by SEPA, and that they had standing to challenge the MDNS.

## II. Judicial Review of an MDNS.

█ SEPA is a legislative pronouncement of our state's environmental policy. It recognizes "the necessary harmony between humans and the environment in order to prevent and eliminate damage to the environment and biosphere, as well as to promote the welfare of humans and the understanding of our ecological systems." *Stempel v. Department of Water Resources*, 82 Wn.2d 109, 117, 508 P.2d 166 (1973). While SEPA does not demand a particular substantive result in government decision making, SEPA does require that "environmental amenities and values will be given appropriate consideration in decision making along with economic and technical considerations." *Stempel*, 82 Wn.2d at 118; RCW 43.21C.030(2)(b).

### A. The Threshold Determination.

Under SEPA, before a local government processes a permit application for a private land use project, it must make a "threshold determination" of whether the project is a "major action significantly affecting the quality of the environment." RCW 43.21C.030(2)(c); *Sisley v. San Juan County*, 89 Wn.2d 78, 82, 569 P.2d 712 (1977). A "threshold

determination" by the "responsible official" of the "lead agency" is required for any proposal that meets the definition of "action" under SEPA and is not "categorically exempt." WAC 197-11-310(1) and (2). In order to facilitate the "threshold determination," the applicant must prepare an environmental checklist, which must provide information reasonably sufficient to evaluate the environmental impact of the proposal. WAC 197-11-315 to 335. The responsible official must then thoroughly consider a proposal's potential environmental significance as documented in the environmental checklist. WAC 197-11--315(1)(a).

Based upon independent review of all relevant information and analysis, the responsible official determines whether the proposal is "likely to have a probable significant adverse environmental impact." WAC 197-11--330(1)(b). The responsible official then renders a "determination of significance" (DS) or a "determination of non-significance" (DNS). A DS mandates intensified environmental review through preparation of an EIS. WAC 197-11-360. Conversely, a DNS means that no EIS will be required. WAC 197-11-340. It does not mean, however, that environmental review will not be undertaken.

### B. Mitigated Determination of Non-Significance.

An alternative threshold determination is the "mitigated determination of non-significance," or "MDNS," which involves changing or conditioning a project to eliminate its significant adverse environmental impacts. WAC 197-11-350. With an MDNS, promulgation of a formal EIS is not required, although, as here, environmental studies and analysis may be quite comprehensive. An applicant may clarify or change a proposal by revising the environmental checklist and permit application so that an MDNS can be issued for the revised project. WAC 197-11-350(2). Alternatively, the governmental agency may specify mitigation measures and issue an MDNS only if the proposal is

changed to incorporate those measures. WAC 197-11--350(3).

## C. Standard of Review.

Selection of environmental review process and protection is left to the sound discretion of the appropriate governing agency, not this court. We review a decision to issue an MDNS under the "clearly erroneous" standard. *Pease Hill Community Group v. County of Spokane*, 62 Wn. App. 800, 809, 816 P.2d 37 (1991). A finding is "clearly erroneous" when, although there is evidence to support it, the reviewing court on the record is left with the definite and firm conviction that a mistake has been committed. *Norway Hill Preservation & Protection Ass'n v. King County Council*, 87 Wn.2d 267, 274, 552 P.2d 674 (1976) (quoting *Ancheta v. Daly*, 77 Wn.2d 255, 259-60, 461 P.2d 531 (1969)). For the MDNS to survive judicial scrutiny, the record must demonstrate that "environmental factors were considered in a manner sufficient to amount to prima facie compliance with the procedural requirements of SEPA," and that the decision to issue an MDNS was based on information sufficient to evaluate the proposal's environmental impact. *Pease Hill*, 62 Wn. App. at 810 (citing *Sisley*, 89 Wn.2d at 85; *Brown v. City of Tacoma*, 30 Wn. App. 762, 766, 637 P.2d 1005 (1981)). Moreover, the mitigation measures imposed must be reasonable and capable of being accomplished. RCW 43.21C.060; WAC 197--11-660(1)(c); *Kiewit Constr. Group, Inc. v. Clark County*, 83 Wn. App. 133, 143, 920 P.2d 1207 (1996). An agency's decision to issue an MDNS and not to require an EIS must be accorded substantial weight. RCW 43.21C.090; *Indian Trail Property Owner's Ass'n v. City of Spokane*, 76 Wn. App. 430, 442, 886 P.2d 209 (1994).

## D. SEPA Public Policy and the MDNS Process.

Buckley contends that use of the MDNS process violated the basic policies of SEPA, WAC 197-11-030(2), in that: (1)

the public did not have useful access to necessary information or the decision-making process; (2) the PALS file that was available for public review was not clear and concise; and (3) the threshold determination process dragged on for an excessive period of time. Buckley further argues that the Hearing Examiner erred in failing to consider adequately the public policies of SEPA,[6] and in giving "substantial weight" to the County's utilization of the MDNS process.

■ The Legislature created the MDNS process to encourage agencies and applicants to work together to reduce the impacts of a project below the threshold level of significance. WAC 197-11-350. With an MDNS, promulgation of an EIS and intense public participation are rendered unnecessary because the mitigated project will no longer cause significant adverse environmental impacts.

Use of mitigation to bring projects into compliance with SEPA, without promulgation of an EIS, has been viewed favorably by the Washington courts. The Washington State Supreme Court deems the MDNS process to be "eminently sensible." *Hayden v. City of Port Townsend*, 93 Wn.2d 870, 880, 613 P.2d 1164 (1980), *overruled on other grounds, SANE v. Seattle*, 101 Wn.2d 280, 676 P.2d 1006 (1984). The Court of Appeals, Division One, has held that

> SEPA encourages compromise and accommodation by requiring that the decisionmaker consider mitigation and state why it is inadequate to relieve the adverse impact. When the decisionmaker imposes some mitigation measures, this does not necessarily mean that unmitigated impacts no longer exist or will be totally eradicated by mitigation, but merely that as mitigated, the project as a whole is acceptable.

---

[6]The policies and goals of SEPA are supplementary to existing agency authority. WAC 197-11-030(1). Agencies have the authority to pursue and grant an MDNS under WAC 197-11-350, so long as all significant adverse environmental impacts are sufficiently mitigated. The public policy objectives listed in WAC 197--11-030(2) are general guidelines for agencies to utilize throughout the SEPA process, and do not override agency authority to work cooperatively with an applicant and to grant an MDNS.

*Victoria Tower Partnership v. City of Seattle*, 59 Wn. App. 592, 603, 800 P.2d 380 (1990) (footnote omitted).

Similarly, the Washington Department of Ecology (DOE) has favorably characterized the MDNS process as conducive to efficient, cooperative reduction or avoidance of adverse environmental impacts:

> The mitigated DNS provision in WAC 197-11-350 is intended to encourage applicants and agencies to work together early in the SEPA process to modify the project and eliminate significant adverse impacts. The mitigated DNS process is not intended to reduce the amount of environmental review done on a project, but to reduce the paperwork needed to document the process.

Richard L. Settle, *DOE Interpretations of Determination of Non-Significant Provisions*, in 1988 SEPA HANDBOOK, G-1 to G-6, app. at 466.

The propriety of bringing a proposal below the significance threshold by informally negotiating project modifications has been embraced by the SEPA Rules and reined in by the requirements of WAC 197-11-350. RICHARD L. SETTLE, THE WASHINGTON STATE ENVIRONMENTAL POLICY ACT — A LEGAL AND POLICY ANALYSIS § 13(d)(vi), at 137-39 (1987). The SEPA Rules provide that if in the course of formulating an MDNS, the lead agency determines that "a proposal continues to have a probable significant adverse environmental impact, even with mitigation measures, an EIS shall be prepared." WAC 197-11-350(2), touchstone of the SEPA review process, provides protection from abuse. If an MDNS is issued and an appealing party proves that the project will still produce significant adverse environmental impacts, then the MDNS decision must be held to be "clearly erroneous" and an EIS must be promulgated.

Our review of the record indicates that PALS thoroughly considered appropriate environmental factors in analyzing RPW's CUP application and environmental checklist, reviewing comments from other state agencies, and formulating 54 mitigation measures included in the

MDNS. After accepting comments and analyzing the proposal, PALS initially determined that the RPW Project was reasonably likely to have a "significant adverse environmental impact." WAC 197-11-330(1)(b). PALS and RPW then worked cooperatively to reduce the project's significant adverse environmental impacts. WAC 197-11-350(2). RPW altered its plans, and PALS imposed substantial mitigating measures.[7] These mitigation measures reduced all significant adverse environmental impacts below the threshold level of significance, such that an EIS was no longer required. WAC 197-11-350(5).

Environmental review was not "avoided" for the RPW Project. Rather, the need for an EIS was superseded by the MDNS. The 54 mitigation measures of the MDNS may provide more effective environmental protection than promulgation of an EIS, since an EIS does not automatically result in substantive mitigation. *See Sisley*, 89 Wn.2d at 89 (An EIS merely assures a full disclosure and consideration of environmental information prior to the construction of the project.).

Buckley has failed to cite any fact or evidence in the record demonstrating that the RPW Project, as mitigated by the 54 MDNS conditions, will cause significant adverse environmental impacts. Despite repeated inquiries at oral argument, Buckley could not identify a single environmental impact that had not been adequately addressed in the MDNS. Buckley's skepticism about the effectiveness of some mitigation measures is speculative at best and does not provide a basis for holding the MDNS to be "clearly erroneous."

■■ Moreover, community displeasure and Buckley's preference for an EIS are inadequate grounds for overturning the decision of the Hearing Examiner. *See, e.g., Maranatha Mining, Inc. v. Pierce County*, 59 Wn. App 795, 804, 801 P.2d 985 (1990). This legal principle was implicitly recognized by the Hearing Examiner and the trial court,

---

[7]*See* summary of conditions at note 2, *supra*.

who despite their contrary personal opinions, nevertheless held as a matter of law that PALS' decision to issue an MDNS was not "clearly erroneous."

Our review of the extensive documentation and scientific analysis regarding the impacts of the RPW Project demonstrates that PALS adequately considered the required environmental factors. The 54 mitigation measures imposed by the MDNS appear to be both reasonably based on thorough analysis and capable of being accomplished.[8] RCW 43.21C.060. Therefore, we cannot say that either the Hearing Examiner's decision to uphold the issuance of the MDNS or the MDNS itself was "clearly erroneous."

### E. Limiting the MDNS Process.

Buckley contends that an MDNS should be issued only for projects with minor environmental impacts. Buckley therefore requests the court to declare that an MDNS is not suitable for the RPW Project as a matter of law because of its size, scope, and complexity. Buckley asks this court to establish guidelines to regulate the use of the MDNS process.

As Buckley concedes, SEPA does not set forth criteria limiting the use of the MDNS process. *See,* WAC 173- -11-350. If the Legislature had intended that the MDNS process be used for only small, simple projects, then it would have so provided. The fact that the RPW Project is large and complex does not foreclose use of the MDNS process.

Buckley argues that we must establish guidelines so that the MDNS process is not abused to become an EIS-avoidance device. *See Brown,* 30 Wn. App. at 767. Issuance of guidelines that limit use of the MDNS process is not a proper function for the courts. Such guidelines, if necessary, are the province of our legislative and execu-

---

[8]*See note 2, supra.*

tive bodies. *See, e.g. Homes Unlimited, Inc. v. City of Seattle*, 90 Wn.2d 154, 158, 579 P.2d 1331 (1978). We therefore decline Buckley's invitation to create such guidelines judicially.

### III. The Urban Area Agreement.

Buckley argues that Pierce County violated the UAA by failing to provide adequate notice of the RPW Project CUP application. Buckley contends that PALS was obligated under the UAA to transmit the CUP application and environmental checklist early in the review process. Pierce County and RPW argue that although procedural errors did occur, the basic obligations of the UAA were followed.

When a party appeals a superior court decision rendered pursuant to a writ of review, this court reviews de novo the record of the Hearing Examiner, not the superior court. *Leavitt v. Jefferson County*, 74 Wn. App. 668, 677, 875 P.2d 681 (1994) (citing *Lejeune v. Clallam County*, 64 Wn. App. 257, 263, 823 P.2d 1144 (1992)). Thus, we must determine whether the decision of the Hearing Examiner regarding the alleged violation of the UAA was "contrary to law."[9] RCW 7.16.120(3); *State ex rel. Lige & Wm. B. Dickson Co. v. County of Pierce*, 65 Wn. App. 614, 617, 829 P.2d 217 (1992).

The UAA required Pierce County to notify the City of Buckley when a project application was submitted and to allow Buckley to submit comments before Pierce County

---

[9]Under the writ statute, issues of fact are normally reviewed to determine if the findings of the hearing examiner are supported by substantial evidence. RCW 7.16.120(5); *Freeburg v. Seattle*, 71 Wn. App. 367, 371, 859 P.2d 610 (1993). But Buckley did not specifically assign error to any of the Hearing Examiner's findings of fact. A separate assignment of error for each finding of fact a party contends was improperly made must be included, with reference to the finding by number. RAP 10.3. Unchallenged findings of fact are considered to be verities on appeal. *Henderson Homes, Inc. v. City of Bothell*, 124 Wn.2d 240, 244, 877 P.2d 176 (1994). Therefore, the only issue before the court is whether the Hearing Examiner's conclusion that Pierce County did not violate the UAA was "contrary to law."

acted on the application. The UAA did not specify a time period within which Pierce County must provide this information to Buckley, but did require Buckley to "notify the County within 15 days of receipt if any proposed action [was] found to be lacking." The UAA required Buckley to submit its concerns in writing and to

1. identify those portions of the proposed action which are inconsistent with adopted plans, policies, or development standards, or comprehensive plans under consideration; and

2. indicate whether Buckley would object; not object; or not object with conditions.

Pierce County would then "consider the City's response prior to taking any action on the application."

Because PALS was inadvertently unaware of the UAA, Pierce County did not inform Buckley of the RPW Project and provide the environmental review materials for more than a year after the CUP application was submitted. However, when PALS learned of the omission, the Director immediately sent copies of the environmental review materials to Buckley, seven weeks *before* the MDNS was issued. Along with these materials, PALS included a letter explaining that an MDNS was "close" to being issued and that Buckley had time to review the proposal and to provide input "before" the MDNS was issued.

The Hearing Examiner determined that even though the County should have informed Buckley of the RPW Project soon after the application was submitted, Buckley eventually had all necessary information and time to comment. The Hearing Examiner noted that the County did not issue the MDNS for seven weeks after informing Buckley about the RPW Project and that Buckley did not submit any comments during that period. Thus, the Hearing Examiner concluded that Pierce County substantially complied with the terms of the UAA and that Buckley did not fulfill its obligations.

We agree. The UAA mandated only that Pierce County was to keep Buckley informed of any land use proposals

that would affect the unincorporated surrounding areas. While Pierce County should have acted sooner in providing the information to Buckley, it remedied its error as soon as it was discovered. Buckley then failed to respond. Buckley cannot now claim that it was "harmed" when it was provided with the opportunity to provide significant input and instead chose to remain silent.

Buckley argues that because the County was so close to issuing the MDNS, any comments from Buckley would have been futile. We disagree. The County's notice indicates that Buckley had time to review the RPW Project proposal and invited Buckley's input weeks *before* the MDNS issued.

Even if we were to hold that the UAA was breached, Buckley cannot establish substantial harm. The UAA provided Buckley with the right only to "comment" on a proposed project. The UAA did not provide Buckley with veto power over a project, nor did the UAA mandate that Pierce County had to follow Buckley's recommendations. Under the terms of the UAA, Pierce County clearly retained decision-making authority. Thus, even if Buckley had been informed of the RPW Project at an earlier date, it is unlikely that the result would have been any different.

Moreover, the UAA does not contain a remedy provision. Buckley asserts that the alleged violation of the UAA warrants repetition of the entire SEPA process. Such a remedy is unrealistic, considering the extensive time and effort that has already been invested by RPW, Pierce County, and the other entities that have provided input.

In sum, Buckley has failed to prove that the UAA was substantively violated or that Buckley has been harmed. The decision of the Hearing Examiner was not "contrary to law." Therefore, we affirm.

### IV. Attorney Fees.

Pierce County and RPW request reasonable attorney

fees and costs on appeal under the recently enacted Regulatory Reform Act, RCW 4.84.370.[10] Buckley points out that this appeal was filed one month before the Regulatory Reform Act became effective, and argues that the statute should not be applied retroactively. We agree.

■ A statute is presumed to operate prospectively only, unless it is remedial in nature or the statutory language contains a clear indication of legislative intent that it apply retroactively. *Adcox v. Children's Orthopedic Hosp. & Med. Ctr.*, 123 Wn.2d 15, 30, 864 P.2d 921 (1993); *Johnston v. Beneficial Management Corp. of Am.*, 85 Wn.2d 637, 641, 538 P.2d 510 (1975). A statute is remedial and has a retroactive application when it relates to practice, procedure, or remedies and does not affect a substantive or vested right. *In re Mota*, 114 Wn.2d 465, 471, 788 P.2d 538 (1990).

■ ■ Statutory language couched in the present and future tenses manifests a legislative intent that the statute should apply prospectively only. *Adcox*, 123 Wn.2d at 30; *Washington State Sch. Dirs. Ass'n v. Department of Labor & Indus.*, 82 Wn.2d 367, 379, 510 P.2d 818 (1973).

---

[10]RCW 4.84.370, a provision providing for fees on appeal, was adopted by the Legislature as part of the Growth Management Act. LAWS OF 1995, ch. 347, § 718. The statute provides as follows:

**Appeal of land use decisions–Fees and costs.** (1) Notwithstanding any other provisions of this chapter, reasonable attorneys' fees and costs shall be awarded to the prevailing party or substantially prevailing party on appeal before the court of appeals or the supreme court of a decision by a county, city, or town to issue, condition, or deny a development permit involving a site-specific rezone, zoning, plat, conditional use, variance, shoreline permit, building permit, site plan, or similar land use approval or decision. The court shall award and determine the amount of reasonable attorneys' fees and costs under this section if:

(a) The prevailing party on appeal was the prevailing or substantially prevailing party before the county, city, or town, or in a decision involving a substantial development permit under chapter 90.58 RCW, the prevailing party on appeal was the prevailing party or the substantially prevailing party before the shoreline[s] hearings board; and

(b) The prevailing party on appeal was the prevailing party or substantially prevailing party in all prior judicial proceedings.

(2) In addition to the prevailing party under subsection (1) of this section, the county, city, or town whose decision is on appeal is considered a prevailing party if its decision is upheld at superior court and on appeal.

The language of RCW 4.84.370 is couched in the present and future tenses; thus, the statute on its face does not appear to apply retroactively. When retroactive application is not expressly provided in a statute, it should not be judicially implied. *Miebach v. Colasurdo*, 102 Wn.2d 170, 180, 685 P.2d 1074 (1984).

The Regulatory Reform Act, RCW 4.84.370, establishes a new right to recover attorney fees on appeal from land use decisions, where no such right previously existed. A statute that creates a new right of action is presumed to apply to future transactions only. *Johnston*, 85 Wn.2d at 641. RPW and Pierce County argue that:

> unless a contrary intent clearly appears from the statute, the right to costs and attorney fees, as well as the determination of the amount thereof, is governed by the statute in force at the *termination* of the action, rather than at the time of its commencement.

*Mackey v. American Fashion Inst. Corp.*, 60 Wn. App. 426, 430, 804 P.2d 642 (1991) (emphasis added) (quoting *City of Bellingham v. Eiford Constr. Co.*, 10 Wn. App. 606, 608, 519 P.2d 1330 (1974)).

However, the cases relied upon by Pierce County and RPW involve existing statutes that were amended to expand their applicability while an action was pending. *Mackey*, 60 Wn. App. at 430; *Bellingham*, 10 Wn. App. at 608. At oral argument, RPW asserted that the Regulatory Reform Act did not create a new cause of action, but rather that the Act simply amended the existing statutory attorney fees provision to increase the availability of recovery for parties who prevail in cases involving land use determinations. We disagree. In the present case, a new statute *established a new right* to recover attorneys fees *after* Pierce County's issuance of the MDNS in May 1992 and Buckley's appeal in July 1992.

Retroactive application of the attorney fees portion of the Regulatory Reform Act is not appropriate. Therefore, the requests for attorney fees and costs under the Regulatory Reform Act are denied.

We affirm the Hearing Examiner's decision upholding the MDNS. We decline to award attorney fees and costs under the Regulatory Reform Act.

It is so ordered.

MORGAN and ARMSTRONG, JJ., concur.

Reconsideration denied June 5, 1997.