47 P.3d 137 (2002)
111 Wash.App. 711
Alvin V. BOEHM and Janice M. Brown-Boehm, husband and wife, Appellants,
v.
CITY OF VANCOUVER, Washington, a municipal corporation, Respondent, and
Roundup Co., Inc., dba Fred Meyer Stores, Inc., Intervenor/Respondent.
No. 27395-1-II.
Court of Appeals of Washington, Division 2.
May 10, 2002.
*139 Mark Erikson, Attorney at Law, Vancouver, Counsel for Appellants.
James J. McNamara, Asst. City Attorney, Timothy McMahan, Attorney at Law, Vancouver, Ramona Monroe, Attorney at Law, Seattle, Counsel for Respondents.
BRIDGEWATER, J.
Alvin Boehm and Janice Brown Boehm (the Boehms) appeal from a superior court judgment that affirmed the City of Vancouver hearing examiner's approval of a preliminary site plan and conditional use permit for Fred Meyer's proposed gas station. We hold that neither the hearing examiner nor the superior court erred in holding that the Boehms failed to properly appeal the concurrency decision. Our review then is properly of the State Environmental Policy Act (SEPA) decision. Further, we hold that SEPA review need not address cumulative impacts when speculative, and that when the Boehms can point to no specific impact, those impacts are speculative. We affirm and grant attorney fees and costs to both the City and Fred Meyer under RCW 4.84.370.
In March 2000, Fred Meyer applied for a conditional use permit and site plan approval from the City to build a gas station adjacent to its Fisher's Landing retail store. Fred Meyer's proposal included a 4,900 square foot canopy, seven double-sided gasoline pumps, a cashier's kiosk, and two underground fuel tanks.
The project would be located within the Fisher's Landing Towncenter Planned Unit Development (PUD)a mixed-use commercial and residential development. Clark County approved the Fisher's Landing Towncenter PUD in 1988, before the City annexed it. Approval and annexation of the PUD were made possible by agreements between Clark County and the City, which specified permitted uses within Fisher's Landing.
When Clark County and the City established their transportation concurrency ordinances, the "concurrency models" assumed full build-out of all approved development *140 projects, including the Fisher's Landing Towncenter. The model assumed 1,665 P.M. peak hour "vested" vehicular trips for the commercial portion of the PUD.
Fred Meyer submitted documentation and traffic studies with its application showing that all trips expected to be generated by the project were already accounted for in the previously approved concurrency model. Based on Fred Meyer's traffic studies and the vested trip determination, the City issued a "Certificate of Concurrency" in March 2000.
In accordance with SEPA, chapter 43.21C RCW, Fred Meyer submitted an environmental checklist. The checklist discussed the project and disclosed its potential environmental impacts.
In May 2000, the City gave notice of its intention to issue a Mitigated Determination of Nonsignificance (MDNS) for the project. On June 5, 2000, the Boehms submitted a SEPA Comment, requesting that the proposed MDNS be withdrawn.
On June 6, 2000, the City issued the MDNS and an Environmental Review Report, which documented the City's reasons for issuing the MDNS. The City's June 6, 2000 "Staff Report" recommended approval of the project, subject to 38 conditions.
On June 19, 2000, the Boehms appealed the MDNS. On June 20, 2000, the City's hearing examiner conducted a public hearing on the project and the Boehms' SEPA appeal. The examiner kept the record open until July 7, 2000, to allow for additional public comment.
In response to public comment, Fred Meyer conducted a traffic study, which found that traffic conditions would worsen after construction of the gas station. Fred Meyer agreed to mitigate the impact by improving the level of service via the installation of signing and striping for an all-way stop.
Ultimately, the examiner found that the MDNS was proper, subject to 39 conditions of approval, and that the Boehms failed to appeal the City's decision under its concurrency ordinance. The Boehms appealed the examiner's final order to the Vancouver City Council, which upheld the decision following a closed-record appeal.
In October 2000, the Boehms appealed to the Clark County Superior Court under the Land Use Petition Act (LUPA), chapter 36.70C RCW. In December 2000, a superior court judge entered an order allowing Fred Meyer to intervene and dismissing several of the Boehms' claims.
In April 2001, a different superior court judge heard argument on the LUPA petition; the judge affirmed the examiner's decision and dismissed the Boehms' appeal. This appeal follows.

Standard of Review
Under LUPA, this court "may grant relief" from a land use decision if the party seeking relief satisfies one of the following standards:
(a) The body or officer that made the land use decision engaged in unlawful procedure or failed to follow a prescribed process, unless the error was harmless;
(b) The land use decision is an erroneous interpretation of the law, after allowing for such deference as is due the construction of a law by a local jurisdiction with expertise;
(c) The land use decision is not supported by evidence that is substantial when viewed in light of the whole record before the court;
(d) The land use decision is a clearly erroneous application of the law to the facts;
(e) The land use decision is outside the authority or jurisdiction of the body or officer making the decision; or
(f) The land use decision violates the constitutional rights of the party seeking relief.
RCW 36.70C.130(1). The Boehms appear to argue that subsection (d) applies here. Thus, they carry the burden to establish that the City Council's application of governing law to the facts was clearly erroneous. A decision is clearly erroneous when, "although there is evidence to support it, the reviewing court on the record is left with the definite and firm conviction that a mistake has been *141 committed." Anderson v. Pierce County, 86 Wash.App. 290, 302, 936 P.2d 432 (1997) (citing Norway Hill Preserv. & Prot. Ass'n v. King County Council, 87 Wash.2d 267, 274, 552 P.2d 674 (1976)).
We stand "in the same position as the superior court when reviewing an administrative decision[,]" Swoboda v. Town of La Conner, 97 Wash.App. 613, 617, 987 P.2d 103 (1999), review denied, 140 Wash.2d 1014, 5 P.3d 9 (2000), and we apply "the appropriate standard of review directly to the administrative record." Wilson v. Employment Sec. Dep't, 87 Wash.App. 197, 200, 940 P.2d 269 (1997). In addition, we review the evidence and any reasonable inferences in the light most favorable to the party that prevailed in the highest forum exercising fact finding authority. Schofield v. Spokane County, 96 Wash.App. 581, 586, 980 P.2d 277 (1999).

State Environmental Policy Act
"SEPA is a legislative pronouncement of our state's environmental policy." Anderson, 86 Wash.App. at 300, 936 P.2d 432. It requires local governments to fully consider the environmental and ecological effects of major actions. See RCW 43.21C.030; Lassila v. City of Wenatchee, 89 Wash.2d 804, 813, 576 P.2d 54 (1978).
Before processing a permit application for a private land use project, SEPA requires local governments to make a threshold determination of whether the project is a "major action[] significantly affecting the quality of the environment[.]" RCW 43.21C.030(2)(c); see also WAC 197-11-330.[1] A major action significantly affects the environment "whenever more than a moderate effect on the quality of the environment is a reasonable probability." Norway, 87 Wash.2d at 278, 552 P.2d 674.
The "lead agency" (here, the City) uses an environmental checklist to review a project's "proposed activities, alternatives, and impacts... in accordance with SEPA's goals and policies." WAC 197-11-060. The responsible official then renders a "determination of significance" (DS) or a "determination of nonsignificance" (DNS). A DS requires intensified environmental review through preparation of an environmental impact statement (EIS). WAC 197-11-360. Conversely, a DNS means that no EIS will be required. WAC 197-11-340.
A MDNS is an alternative threshold determination that involves changing or conditioning a project to eliminate its significant adverse environmental impacts. Anderson, 86 Wash.App. at 301, 936 P.2d 432; WAC 197-11-350. With a MDNS, a formal EIS is not required. Anderson, 86 Wash.App. at 301, 936 P.2d 432. Thus, SEPA only requires an EIS for "major actions having a probable significant, adverse environmental impact." RCW 43.21C.031(1).
We review a threshold determination that an EIS is not required under the "clearly erroneous" standard. Norway, 87 Wash.2d at 275, 552 P.2d 674. When applying this standard, we do more than merely determine whether substantial evidence supports the decision; we are also required to consider the public policy and environmental values of SEPA. Sisley v. San Juan County, 89 Wash.2d 78, 84, 569 P.2d 712 (1977).
For the MDNS to survive judicial scrutiny, the City must demonstrate that it actually considered relevant environmental factors[2] before reaching that decision.[3] Moreover, the record must demonstrate that *142 the City adequately considered the environmental factors "in a manner sufficient to be prima facie compliance with the procedural dictates of SEPA." Lassila, 89 Wash.2d at 814, 576 P.2d 54; see also Anderson, 86 Wash.App. at 302, 936 P.2d 432. Further, the decision to issue a MDNS must be based on information sufficient to evaluate the proposal's environmental impact. Anderson, 86 Wash.App. at 302, 936 P.2d 432; WAC 197-11-335. We accord substantial weight to an agency's decision to issue a MDNS and not require an EIS.[4]
I. Did the City satisfy its burden of demonstrating prima facie compliance with SEPA's procedural requirements?
A. Cumulative Impacts Assessment
The Boehms claim that the record fails to demonstrate prima facie compliance with SEPA's procedural requirements and thus, conclude that the examiner and trial court erred in affirming the City's threshold determination. Specifically, the Boehms argue that the threshold determination should be remanded because the City did not consider the site-specific[5] impacts of the project, namely its "cumulative impacts".[6]
We note that in March 2000, Fred Meyer submitted an environmental checklist, under chapter 43.21C RCW, that described the project in detail and discussed its impacts on the earth, air, water, plants, animals, energy and natural resources, environmental health, land, housing, light and glare, recreation, historic and cultural preservation, transportation, public service and utilities. The City also prepared an Environmental Review Report describing the project's potential environmental impacts and required mitigation measures. In contrast, the Boehms presented no evidence regarding any probable significant adverse environmental impacts of the project. Therefore, when the Boehms complain of a failure to adequately identify or mitigate adverse impacts, they have produced no evidence that such impacts exist. It was at this stage that the hearing examiner issued the MDNS and found that the Boehms had not properly filed an appeal under the concurrency ordinance.
Also, as a general proposition, the nature of cumulative impacts is prospective and not retrospective. A cumulative impact analysis need only occur when there is some evidence that the project under review will facilitate future action that will result in additional impacts. Tucker v. Columbia River Gorge Comm'n, 73 Wash.App. 74, 81-83, 867 P.2d 686 (1994).
We agree with Fred Meyer and the City. The project's cumulative impacts are merely "speculative" and therefore, need not be considered.[7] The Boehms have not clearly identified evidence of a cumulative impact.
We also hold that the cumulative impact argument must fail unless the Boehms can demonstrate that the project is dependent on subsequent proposed development. In SEAPC v. Cammack II Orchards, *143 49 Wash.App. 609, 744 P.2d 1101 (1987), the plaintiffs challenged the approval of a subdivision, arguing that "the County erred in refusing to consider the development's future cumulative impact beyond the ... subdivision." SEAPC, 49 Wash.App. at 614, 744 P.2d 1101. Division Three of this court excused the county's refusal to consider future cumulative impacts:
An EIS need not cover subsequent phases if the initial phase under construction is substantially independent of the subsequent... phases, and the project would be constructed without regard to future developments. In the instant case, although future development was not totally ruled out, it cannot be said the ... subdivision was dependent upon subsequent proposed development.
SEAPC, 49 Wash.App. at 614-15, 744 P.2d 1101 (citation omitted). Here, the development is on the parking lot adjacent to the Fred Meyer store; it is intended to service persons shopping at Fred Meyer and is unlikely to have future development.
A review of the record indicates that the City thoroughly considered appropriate environmental factors in analyzing Fred Meyer's proposed gas station application and environmental checklist, reviewing comments from others, and formulating numerous mitigation measures included in the MDNS. After reviewing the environmental information, the City attached five conditions to the project by issuing a MDNS, which respondents argue minimized any adverse environmental impact.[8] Furthermore, the hearing examiner's final order included 39 conditions of approval.
Thus, there is no evidence that a cumulative impact analysis is required. The environmental impacts were assessed, found not to be significant, and there is no evidence to the contrary.
B. Fred Meyer's Post-MDNS Traffic Study
The Boehms also argue that Fred Meyer's traffic study (dated July 7, 2000) demonstrates that adverse traffic impacts will result from the project. Fred Meyer completed this traffic study in response to public comment. The study revealed that due to pre-existing deficiencies, an intersection near the project would drop from a level of service (LOS) "E" condition to an LOS "F" after construction of the gas station. Fred Meyer voluntarily agreed to mitigate this impact by improving the LOS to "C" by installing signs and stripes for an all-way stop control. The City approved the analysis and made the installation a condition of project approval. Thus, any adverse impact the project might have on the intersection was considered and mitigated.
II. Did the hearing examiner and the superior court err in failing to reverse the SEPA determination based on "unlawful piecemealing"?
The Boehms contend that the review of Fred Meyer's project was improperly piecemealed. But as respondents correctly point out, this argument was not made below and this court cannot consider it. RAP 2.5(a).
The Boehms claim that they raised this issue below and cite to several pages in the record. But the cited pages never refer to piecemealing. Indeed, the Boehms' LUPA petition, "SEPA Comment" and "Comment & Notice of SEPA Appeal" do not mention this issue. See Citizens for Mount Vernon v. City of Mount Vernon, 133 Wash.2d 861, 868, 947 P.2d 1208 (1997) (applying to LUPA the requirement under the Administrative Procedure Act that for remedies to be exhausted issues must first be raised before the administrative agency). *144 Furthermore, "[i]n order for an issue to be properly raised before an administrative agency, there must be more than simply a hint or a slight reference to the issue in the record." King County v. Wash. State Boundary Review Bd., 122 Wash.2d 648, 670, 860 P.2d 1024 (1993).
III. Did the hearing examiner and the superior court err in dismissing Appellants' concurrency appeal?
Before approving a proposal for development, the Growth Management Act requires local governments to determine that sufficient transportation capacity exists to serve the development. RCW 36.70A.070. In keeping with this requirement, the City completed a concurrency review and issued a certificate of concurrency to Fred Meyer in March 2000.
The hearing examiner found that he lacked jurisdiction to consider the Boehms' challenge to the certificate, since they had not filed an appeal under the Vancouver Municipal Code (VMC) 11.95. The trial court affirmed the examiner's decision. The Boehms contend that the examiner and trial court erred in dismissing their concurrency appeal.
The relevant part of VMC 11.95 provides:
The issuance ... of a certificate of concurrency... may be appealed by any aggrieved party. Provided that such appeal shall be filed within the timelines set forth below and consolidated with the open record hearing on the approval of the development application, where such approval hearing is required by VMC Chapter 20.00.
(1) Where an appeal under this chapter is required to be consolidated with a development approval hearing, a request for appeal shall be filed with the director no less than five (5) days prior to the date scheduled for the approval hearing.
VMC 11.95.130(E). The ordinance required the Boehms to appeal the certificate of concurrency at least five days before the approval hearing; they failed to do so.
A. Did the Boehms' SEPA Appeal Satisfy the Requirements of VMC 11.95.130?
First, the Boehms argue that their "SEPA Comment" (filed more than five days before the approval hearing) and "Comment and Notice of SEPA Appeal" (filed one day before the hearing) satisfied the concurrency ordinance's appeal requirements. An appeal of a certificate of concurrency must include the following:
(a) The identity and mailing address of the applicant or aggrieved party requesting such appeal;
(b) An identification of the development application for which the issuance, conditional issuance, or denial of a certificate of concurrency ... was determined by the director, or other action or omission appealed;
(c) A statement of the current status of the development application before the Development Review Authority (where applicable);
(d) The date of the determination, action, or omission of the director;
(e) A statement of the basis or grounds for the appeal.
VMC 11.95.130(A).
Both of the documents the Boehms refer to fail to mention the certificate of concurrency or the date it was issued. Thus, they failed to satisfy VMC 11.95.130(A)(d). Furthermore, the Boehms did not pay the appeal fee required by VMC 11.95.130(A). See Graham Thrift Group, Inc. v. Pierce County, 75 Wash.App. 263, 269, 877 P.2d 228 (1994) ("A legislative body may determine that the interest in finality justifies applying a mandatory time limit for filing an appeal and paying a filing fee. This is particularly true in the context of land use decisions, where time is usually of the essence for the parties involved.").
B. Substantial Compliance
Second, the Boehms argue that they substantially complied with the concurrency ordinance, which should excuse any procedural defect. Even assuming that the doctrine of substantial compliance applies, the Boehms have not satisfied its requirements. Our Supreme *145 Court has held that "failure to comply with a statutorily set time limitation cannot be considered substantial compliance with that statute." City of Seattle v. Pub. Employment Relations Comm'n, 116 Wash.2d 923, 929, 809 P.2d 1377 (1991).

IV. Attorney fees
Under RCW 4.84.370, the City and Fred Meyer are entitled to attorney fees and costs on appeal if they prevail. Here, the City and Fred Meyer prevailed before the City council and the trial court. We affirm, thus, the City and Fred Meyer may obtain attorney fees and costs by complying with RAP 18.1.
Affirmed.
MORGAN, J. and QUINN-BRINTNALL, A.C.J., concur.
NOTES
[1] WAC 197-11-330 specifies the criteria and procedures for determining whether a proposal is likely to have a significant adverse impact. For example, the lead agency's "responsible official" must take into account that the proposal may have a significant adverse impact in one location but not in another; that several marginal impacts when considered together may result in a significant adverse impact; and that for some proposals, it may be impossible to forecast environmental impacts with precision. WAC 197-11-330(3). A threshold determination must not balance whether the beneficial aspects of a proposal outweigh its adverse impacts. WAC 197-11-330(5).
[2] WAC 197-11-444 lists relevant environmental elements.
[3] RCW 43.21C.030(2)(c); Lassila, 89 Wash.2d at 813, 576 P.2d 54; Juanita Bay Valley Cmty. Ass'n v. City of Kirkland, 9 Wash.App. 59, 73, 510 P.2d 1140, review denied sub nom., State v. Silverthorn, 83 Wash.2d 1001 (1973).
[4] RCW 43.21C.090; Anderson, 86 Wash.App. at 302, 936 P.2d 432; Indian Trail Prop. Owner's Ass'n v. City of Spokane, 76 Wash.App. 430, 442, 886 P.2d 209 (1994).
[5] See RCW 43.21C.240(1), (2)(a) (a city may determine that "the requirements for environmental analysis, protection, and mitigation measures in the ... city'[s] ... development regulations and comprehensive plans ... provide adequate analysis of and mitigation for the specific adverse environmental impacts of the project" if it considers the "specific probable adverse environmental impacts of the proposed action and determines that these specific impacts are adequately addressed by the development regulations or other applicable requirements of the comprehensive plan[.]") (emphasis added).
[6] See WAC 197-11-060(4) (An EIS is to analyze "direct, indirect, and cumulative impacts[.]"); see also Cheney v. City of Mountlake Terrace, 87 Wash.2d 338, 344, 552 P.2d 184 (1976) ("Implicit in [SEPA] is the requirement that the decision makers consider more than what might be the narrow, limited environmental impact of the immediate, pending action. The agency cannot close its eyes to the ultimate probable environmental consequences of its current action.").
[7] WAC 197-11-060(4)(a) (SEPA "require[s] the consideration of `environmental' impacts ... with attention to impacts that are likely, not merely speculative."); see also Tugwell v. Kittitas County, 90 Wash.App. 1, 12, 951 P.2d 272 (1997) ("Examination of [an anticipated development's] potential impacts" is speculative since "there are no specific plans to review and the impacts therefore are unknown.").
[8] The five conditions were:

(1) A restriction upon construction activity during evening and early morning hours.
(2) A requirement to use best available control technology to control particulate emissions.
(3) A requirement to employ approved dust suppression methods to capture particulate matter.
(4) A requirement to obtain the necessary approvals from the Southwest Air Pollution Control Authority.
(5) A requirement to take measures to protect cultural resources discovered during development.
Exhibit 21.