[No. 47262-3-I.  Division One.  March 5, 2001.]

SHERILYN WELLS, ET AL., *Respondents*, v. WHATCOM COUNTY WATER DISTRICT NO. 10, ET AL., *Appellants*.

*Richard L. Settle* (of *Foster Pepper & Shefelman, P.L.L.C.*); and *Brian L. Hansen* (of *Resick, Hansen & Follis*), for appellant Whatcom County Water District No. 10.

*David S. McEachran, Prosecuting Attorney*, and *Karen L. Frakes, Deputy*, for appellant Whatcom County.

*Robert M. Tull* and *Mark J. Lee* (of *Langabeer, Tull & Lee, P.S.*), for appellant Sudden Valley Community Association.

*Sherilyn Wells*, pro se.

*Roger L. Ellingson* (of *Law Offices of Ellingson & Arntzen, P.S.*), for respondent Watershed Defense Fund.

AGID, C.J. — After a county hearing examiner approved a conditional use permit (CUP) for a sewer interceptor near Lake Whatcom, opponents of the project filed a land use petition in superior court. They raised numerous issues. Of those, the trial court agreed that the examiner erred by refusing to require a supplemental environmental impact statement (SEIS) before approving the CUP and by considering the vested rights of property owners and related constitutional takings issues. The trial court remanded to the agency level for completion of an SEIS and reconsideration of the CUP, and ordered the examiner to disregard any property rights or takings issues. We hold that the exam-

iner was correct when he rejected as untimely the opponents' request for an SEIS and that his consideration of the property owners' interests was not improper. We therefore reverse the trial court and reinstate the hearing examiner's decision approving the CUP.

## FACTS AND PROCEDURAL HISTORY

The parties involved in this appeal are: Whatcom County Water District No. 10 (the District); the Sudden Valley Community Association (SVCA); Sherilyn Wells; and the Watershed Defense Fund (WDF). The District was established in 1968 and provides water and sewer service to portions of the Lake Whatcom (the Lake) watershed, including the Sudden Valley and Geneva subdivisions southwest of the Lake. SVCA is the homeowners association for Sudden Valley lot owners. Wells is an individual property owner in the Lake's watershed area. WDF is a nonprofit environmental advocacy group.

The Lake is the District's sole source of drinking water. In 1971, the District constructed a sewage interceptor along Lake Whatcom Boulevard to convey sewage out of the Lake's watershed to Bellingham's sewage treatment facility. The interceptor was designed to provide adequate capacity for the first 20 years of development in the area. The District anticipated it would need a second interceptor by the early 1990s as existing platted lots were developed.

As expected, the first interceptor approached capacity about 10 years ago, causing the rate of sewage overflows to increase during rainy periods when storm water infiltrated the sanitary sewer system. As a result, the first interceptor could no longer adequately accommodate existing development or new homes, and the only sewage treatment option for newly-constructed residences was individual septic systems. In 1992, the District adopted a moratorium on new sewer service, thus precluding property owners from building homes on lots that had been approved for residential construction many years earlier.

In 1991, the District adopted a comprehensive plan to provide additional sewer capacity by constructing, in accordance with the Shoreline Management Act, a second interceptor parallel to the existing one along Lake Whatcom Boulevard.[1] According to the District, the second interceptor "would provide the capacity necessary to avoid sewage overflows from the existing interceptor, extend service to homes presently on septic systems, and serve new homes on existing lots." Wells and others opposed the District's application for a shoreline permit, arguing that an alternative location along Lake Louise Road was preferable for the new interceptor.[2] Their efforts were ultimately successful.[3] Pending final disposition of the legal challenges, the District began contingency planning for an interceptor along Lake Louise Road.[4]

After the Lake Whatcom Boulevard site litigation concluded, the District held public hearings and, in a final environmental impact statement (FEIS) completed in September 1997, considered the environmental impacts of and all reasonable alternatives to installing the interceptor along Lake Louise Road.[5] Wells and WDF challenged the FEIS before the District's Board of Commissioners, but after an evidentiary administrative hearing, the Board approved it on November 6, 1997. Neither Wells nor WDF appealed the Board's decision to court. The District subsequently issued and published a Notice of Action, as authorized by the State Environmental Policy Act (SEPA), RCW

---

[1] Lake Whatcom Boulevard runs along the southwest side of the Lake.

[2] Lake Louise Road generally runs parallel to Lake Whatcom Boulevard but is farther away from the Lake.

[3] *See Whatcom County Water Dist. 10 v. Whatcom Neighborhood Ass'n*, No. 35804-9-I, (Wash. Ct. App. Dec. 27, 1995), *review denied*, 129 Wn.2d 1015 (1996).

[4] Ironically, Wells and others opposed the District's preliminary efforts to plan the Lake Louise Road interceptor at the same time they were arguing that Lake Louise Road was a more suitable location than the Lake Whatcom Boulevard site.

[5] The District simultaneously sought approval for a sewage detention basin in Sudden Valley to provide limited, short-term relief from sewage overflows and the moratorium. The permit was granted despite opposition from Wells and WDF.

43.21C.080, giving notice that the agency was proceeding with its efforts to provide "conveyance, storage, and/or treatment capacity for wastewater flows on the south shore of Lake Whatcom . . . in accordance with the [FEIS]."

The District then submitted a CUP application to Whatcom County for the interceptor along Lake Louise Road. A Whatcom County Hearing Examiner granted the permit, with conditions, in November 1998. Wells appealed that decision to the Whatcom County Council, which affirmed it in March 1999. Wells and WDF then appealed the permit decision under the Land Use Petition Act (LUPA) in Skagit County Superior Court,[6] raising numerous claims including the adequacy of the environmental review done for the project.

The trial court ultimately dismissed or rejected the majority of the petitioners' claims, but ruled in favor of Wells and WDF on the SEIS and property owner issues mentioned above. After the court entered its remand order, the District and the SVCA petitioned the Supreme Court for direct review. The petition was denied and the case transferred to this court. Wells and WDF cross-appeal, contending the hearing examiner erred on multiple grounds.

## DISCUSSION

### Standard of Review

■ Judicial review of land use decisions is governed by LUPA, chapter 36.70C RCW. A court may grant relief only if the party seeking relief establishes that at least one of the standards delineated in RCW 36.70C.130(1) has been met.[7]

---

[6] Wells originally appealed to the Whatcom County Superior Court, and after a voluntary dismissal in that court, took her appeal to Skagit County.

[7] That section provides:

(1) . . . The court [reviewing a land use petition] may grant relief only if the party seeking relief has carried the burden of establishing that one of the standards set forth in (a) through (f) of this subsection has been met. The standards are:

(a) The body or officer that made the land use decision engaged in unlawful procedure or failed to follow a prescribed process, unless the error was harmless;

We stand in the shoes of the superior court and review the hearing examiner's action de novo on the basis of the administrative record.[8] The proper focus of our inquiry is therefore the examiner's rejection of the SEIS request and approval of the CUP, rather than the trial court's decision.

*Supplemental Environmental Impact Statement*

We affirm the hearing examiner's ruling rejecting the SEPA/EIS argument for two reasons. First, the information Wells and WDF rely on to argue that the District must prepare an SEIS does not qualify as "new information" under the SEPA regulations. Second, to the extent Wells and WDF are attacking the adequacy of the FEIS, their challenge is untimely under SEPA because they failed to file a LUPA petition within the time allowed by RCW 43-.21C.080.

■■ WAC 197-11-600 contains the regulations implementing SEPA. Under those administrative rules, an agency must supplement an existing EIS if there is "[n]ew information indicating a proposal's probable significant adverse environmental impacts."[9] In a letter dated October 30, 1998, the day the administrative record closed, Wells and WDF submitted a memo to the hearing examiner requesting that he order an SEIS based on "new informa-

---

(b) The land use decision is an erroneous interpretation of the law, after allowing for such deference as is due the construction of a law by a local jurisdiction with expertise;

(c) The land use decision is not supported by evidence that is substantial when viewed in light of the whole record before the court;

(d) The land use decision is a clearly erroneous application of the law to the facts;

(e) The land use decision is outside the authority or jurisdiction of the body or officer making the decision; or

(f) The land use decision violates the constitutional rights of the party seeking relief.

RCW 36.70C.130(1); *see also Girton v. City of Seattle*, 97 Wn. App. 360, 362-63, 983 P.2d 1135 (1999), *review denied*, 140 Wn.2d 1007 (2000).

[8] *Girton*, 97 Wn. App. at 363.

[9] WAC 197-11-600(3)(b)(ii).

tion." That information was an August 1998, unsigned "interim agreement" between "interested agencies," which stated that the City of Bellingham would reduce the amount of diversion from the Nooksack River to the Lake in January and February 1999 if certain levels of stream flow did not occur. The record indicates that Bellingham has regularly diverted water from the Nooksack River into the Lake to increase the Lake's flushing rate and thereby enhance water quality. According to Wells and WDF, the interim agreement signals potential future reductions in the diversion which would increase the effect of pollution. They contend that this information requires an SEIS.

The hearing examiner did not comment explicitly on the SEIS request in his written decision. Rather, he generally declined to review any arguments about the adequacy of the FEIS, noting that "[o]nly one [FEIS adequacy] appeal at an administrative level is allowed."[10] We affirm the examiner's denial of the SEIS request for the reasons discussed below.

First, the Nooksack River interim agreement did not establish "new information indicating a proposal's probable significant adverse environmental impacts" and therefore did not require the District to supplement the FEIS. According to WAC 197-11-782, " '[p]robable' means likely or reasonably likely to occur, as in 'a reasonable probability of more than a moderate effect on the quality of the environment[.]' "[11] Notably, the term "[p]robable is used to distinguish likely impacts from those that merely have a possibility of occurring, but are remote or speculative."[12] The

---

[10] If an agency has a procedure for appeals of environmental determinations under SEPA, the procedure "[s]hall allow no more than one agency appeal proceeding on each procedural determination (the adequacy of a determination of significance/nonsignificance or of a final environmental impact statement)[.]" RCW 43.21C.075(3)(a). As noted above, WDF and Wells had already appealed the adequacy of the FEIS to the District's board and failed to appeal the Board's approval of the FEIS any further.

[11] This definition incorporates the definition of "significant" as used in SEPA, which is "a reasonable likelihood of more than a moderate adverse impact on environmental quality." WAC 197-11-794(1).

[12] WAC 197-11-782.

change in the amount of diversion as it is described in the interim agreement does not meet these criteria. In fact, there is not even any scientific information supporting the hypothesis that the agreement, if implemented, would increase pollution in the Lake. In addition, the document reflects only a temporary arrangement and, because it is unsigned, we cannot even ascertain whether it is an operative agreement. Under these circumstances, we can give the interim agreement no weight, and it certainly is not the kind of "new information" that requires an SEIS.

But even if the interim agreement were "new information," neither the examiner nor the trial court could properly order an SEIS because the issue was time-barred by RCW 43.21C.080. In accordance with RCW 43.21C-.080(1), the District filed and published a Notice of Action (Notice), dated November 28, 1997, stating its decision to proceed with the Lake Louise Road interceptor project based on the FEIS. According to RCW 43.21C-.080(2)(a), that Notice triggered a 21-day time limit for bringing SEPA challenges, but neither WDF nor Wells challenged the action on any ground within that time frame.[13] The 21-day time limit applies to all challenges alleging SEPA noncompliance, and it therefore barred the argument that the interim agreement required further environmental review. Although the WAC provisions require supplementation of an existing environmental impact statement (EIS) if there is "[n]ew information indicating a proposal's probable significant adverse environmental impacts,"[14] that regulation is subject to statutory provisions

---

[13] RCW 43.21C.080(2)(a) provides:

Except as otherwise provided in RCW 43.21C.075(5)(a) [not applicable here], any action to set aside, enjoin, review, or otherwise challenge any such governmental action or subsequent governmental action for which notice is given as provided in subsection (1) of this section on grounds of noncompliance with the provisions of this chapter shall be commenced within twenty-one days from the date of last newspaper publication of the notice pursuant to subsection (1) of this section, or be barred.

[14] See WAC 197-11-600(3)(b)(ii).

imposing time limits on challenging actions for which an EIS is required.[15] RCW 43.21C.080(2)(a) establishes that the Legislature intended to prohibit multiple challenges to proposals based on allegations of SEPA noncompliance.

■ Although RCW 43.21C.080(2)(b) allows further SEPA challenges where, as here, "subsequent governmental action on the proposal for which notice has been given" is taken, that provision is limited to two particular situations absent here.[16] Under that section, the CUP process is a "subsequent governmental action," i.e., the next in a series of approvals needed to actually build the Lake Louise Road interceptor.[17] But it requires that in order to challenge, again, the adequacy of the FEIS, Wells and WDF must show that one of two conditions exists. Namely, there must either be a substantial change in the proposal, approval of which would likely have new significant adverse environmental impacts, or an impact previously identified as needing further evaluation. Because neither circumstance is present here, any challenge to the District's FEIS is barred.

■ We also reject WDF's contention that the action described in the Notice of Action did not constitute "substantive agency action" and that the Notice therefore did

---

[15] Administrative rules must be reasonably consistent with the statute they implement. *See, e.g., Armstrong v. State,* 91 Wn. App. 530, 537, 958 P.2d 1010 (1998), *review denied,* 137 Wn.2d 1011 (1999).

[16] RCW 43.21C.080(2)(b) provides:

Any subsequent governmental action on the proposal for which notice has been given as provided in subsection (1) of this section shall not be set aside, enjoined, reviewed, or otherwise challenged on grounds of noncompliance with the provisions of RCW 43.21C.030(2)(a) through (h) unless there has been a substantial change in the proposal between the time of the first governmental action and the subsequent governmental action that is likely to have adverse environmental impacts beyond the range of impacts previously analyzed, or unless the action now being considered was identified in an earlier detailed statement or declaration of nonsignificance as being one which would require further environmental evaluation.

[17] In contrast, the initial government action, the action for which the FEIS was prepared, was the District's decision to undertake the interceptor project. All later actions necessary to implement that decision, e.g., permit approvals, are "subsequent" actions subject to RCW 43.21C.080(2)(b).

not trigger the 21-day time limit for SEPA challenges. The District's Notice is typical of notices of governmental action and adequately described that action as "[p]rovision of conveyance, storage, and/or treatment capacity for wastewater flows on the south shore of Lake Whatcom in Whatcom County, Washington, in accordance with the [FEIS] dated September 5, 1997." The Notice also referred to the various alternative actions the District planned to pursue, as described in the FEIS, and explicitly stated that "[a]ny action to set aside, enjoin, review, or otherwise challenge such action on the grounds of noncompliance with [SEPA] shall be commenced on or before Friday, January 2, 1998, or be forever barred." No further information was needed to trigger the 21-day limit.

■ WDF seeks to demonstrate that the action was not "substantive" by comparing the action described in the Notice of Action to the minutes from the District's Board meeting on November 19, 1997. That effort is inappropriate, and we cannot consider the argument. The minutes are not a part of the record on appeal and, even if they were, they have no bearing on the question of whether the Notice itself was adequate to trigger the 21-day SEPA appeal period. We therefore grant the District's motion to strike those portions of WDF's response and reply briefs containing arguments based on the Board minutes and exhibits. We also grant the District's request for sanctions against WDF in the amount of $500 for the cost of bringing the motion to strike.[18]

In sum, we affirm the examiner's decision refusing to consider the EIS issue and reverse the trial court's ruling to the contrary, as well as its order granting limited discovery, and grant the District's motion to strike and for sanctions.[19]

---

[18] *See* RAP 18.9(a).

[19] We have not addressed SVCA's arguments related to the SEIS issue because they are based on an arbitrary and capricious standard of review. That standard does not apply here. LUPA explicitly states that in order for a reviewing court to grant relief, "it is not necessary for a court to find that the local jurisdiction engaged in arbitrary and capricious conduct." RCW 36.70C.130(2).

*The Conditional Use Permit Decision*

Wells and WDF first contend that the hearing examiner based his approval of the District's CUP application on an inappropriate consideration of property owners' vested rights and related takings issues. Their argument is flawed.

As we noted above, the District imposed a moratorium on new sewer service in 1992 that has left numerous landowners unable to develop their property. Many of those landowners testified at the CUP hearing about their inability to build on their land. The hearing examiner's written CUP decision contains a few references to vested property rights and related takings issues. The trial court determined these comments were inappropriate and remanded on that basis, stating: "The issues of vested property rights and inverse condemnation are not part of the appropriate review by the Hearing Examiner on this CUP application. On remand, the Hearing Examiner is to base his decision on the applicable Whatcom County land use regulations." We reverse that decision.

As we stated above, in a LUPA case, this court reviews the hearing examiner's decision de novo on the basis of the administrative record.[20] LUPA provides that the reviewing court may grant relief if the land use decision is beyond the authority or jurisdiction of the officer making the decision.[21] As the petitioners challenging the permit, WDF and Wells have the burden of establishing that standard was met.[22]

A review of the challenged references in the context of the complete 38-page decision indicate the CUP decision

---

[20] *Girton*, 97 Wn. App. at 363. Citing pre-LUPA cases, WDF incorrectly claims in its brief that the appropriate standard of review is whether the hearing examiner's decision was arbitrary, capricious, or contrary to law.

[21] RCW 36.70C.130(1)(e). WDF proposes instead that the applicable standard is RCW 36.70C.130(1)(f), which allows relief if the land use decision violates the constitutional rights of the party seeking relief. But neither the record nor the parties' arguments suggest that the hearing examiner's comments on property rights violated *WDF's* or *Wells'* constitutional rights. Rather, the question is whether the hearing examiner improperly based his decision on consideration of *property owners'* constitutional rights.

[22] RCW 36.70C.130(1).

was not based on considerations beyond the hearing examiner's authority. First, contrary to WDF's and Wells' claims, the examiner did not make any actual findings or reach any conclusions about whether further delay to or ultimate denial of the second interceptor project would violate property owners' vested rights or constitute an unconstitutional taking. Second, our review of the examiner's decision indicates his comments were primarily in response to the property owners' testimony and to Wells' desire for a moratorium on development in the area, a view she has expressed not only here but in every other proceeding related to the second interceptor. Finally, both statements were related to the examiner's discussion of whether the proposal met particular criteria in the CUP ordinance and did not affect the substance of his decision.

The first disputed comment reads:

> It is possible that, when the controversy regarding Whatcom County's compliance with the Growth Management Act is finally resolved, little new subdivision will be allowed within the Lake Whatcom watershed. Even if that is the final outcome, it does not deal with the nearly four thousand already legally created parcels which are undeveloped at this time. . . . There are numerous ways to reduce the adverse impacts on the water quality of Lake Whatcom. These methods include reducing or eliminating additional residential development, mitigating the impacts of or eliminating logging within the watershed, and improved storm water treatment. *Denying existing land owners the right to develop their land with even single family residences, without compensation, through the denial of sewer service, in order to protect the public interest in the water quality of Lake Whatcom, is inappropriate and may amount to a taking of private property for public use without compensation.* [23]

This statement relates to the CUP criterion that the proposal "[w]ill not result in the destruction, loss or damage of any natural, scenic or historic feature of major importance." [24] When viewed in context, it is evident the hearing

---

[23] (Emphasis added.)

[24] WHATCOM COUNTY CODE (WCC) 20.84.220(8).

examiner was observing here that, despite the fact that the interceptor would allow previously-permitted development to proceed, it would not damage Lake Whatcom's water quality in light of the record evidence that many methods were available to safeguard the water quality. The hearing examiner merely surmised that it was not necessary to rely on an approach that *may* implicate property owners' constitutional rights when other alternatives were available.

The other challenged comment reads

> The proposal will not be detrimental to the economic welfare of the service area in which it is located. The proposal should aid in economic recovery for lot owners who will now be able to utilize their property, on which they pay taxes and homeowner association dues, but have been unable to develop. *Should government determine that the impact from allowing this residential in-filling result in an unacceptable impact on a public resource (Lake Whatcom), the government should then determine a way to provide adequate compensation to property owners denied development by this decision.*[25]

Here, the examiner was evaluating whether the interceptor was consistent with the CUP criterion requiring that the proposal "will not be detrimental to the economic welfare of the community."[26] Again, the examiner did not overstep the bounds of his authority. While his comment about compensation was unnecessary, it was made in the context of a CUP criterion and clearly did not influence his evaluation of that factor.

WDF argues that "the hearings [sic] examiner's conclusion of law, that denial of this [CUP] would constitute an unconstitutional taking without just compensation, is contrary to law." The issue is not whether the hearing examiner's comments were a correct statement of the law, but rather whether the examiner inappropriately based his CUP decision on those comments. Thus, WDF's discussion of cases that illuminate the nature of vested property rights is irrelevant. And Wells' cursory claim that the hearing

---

[25] (Emphasis added.)

[26] WCC 20.84.220(5).

examiner's "delegation of power does not confer the authority to decide issues of inverse condemnation or vested property rights, unless they are specifically provided for in the zoning ordinance" is similarly unhelpful. In sum, we hold the hearing examiner's mention of landowners' property rights does not merit relief under LUPA's standards.

Related to the hearing examiner's comments about vested rights, Wells next claims the examiner was not a neutral decision maker and her due process rights were therefore violated. We also reject this argument.

As it pursued the sewer interceptor project, the District simultaneously sought approval for a sewage detention basin in Sudden Valley to provide limited, short-term relief from sewage overflows and from the moratorium on building on platted lots. The District secured a CUP for the basin, and some of the exhibits and transcripts from the hearing on that matter were incorporated into the record for the sewer interceptor CUP application. Wells focuses on a quote from the detention basin hearing in which the hearing examiner says he is "not going to stop development on vested lots . . . it's not appropriate to take existing single family lots and say you can't build on it, but we're not giving you anything for it." Wells claims this statement demonstrates the hearing examiner was not a fair and neutral decision maker when reviewing the CUP application for the sewer interceptor because it "certainly lead[s] a disinterested observer to conclude that he had prejudged the facts and the law in advance of hearing the CUP for the interceptor line." Accordingly, Wells requests that any remand of this matter go to a different hearing examiner.

As the District points out, Wells did not raise the issue of the hearing examiner's impartiality at either the administrative or trial court level. Further, she relies mainly on federal cases and ignores the applicable appearance of fairness doctrine which, for land use decisions, is codified in chapter 42.36 RCW. In addition, the comment is taken out of context and does not demonstrate bias. Finally, the relief she requests—that a different examiner hear the case on remand—is irrelevant given our decision.

We next consider the project opponents' claim that the hearing examiner erred by concluding that additional traffic associated with the new interceptor is a result of previous land use decisions allowing development, rather than a direct impact of the interceptor itself.[27] One CUP criterion is that the project "not involve uses, activities, processes, materials, equipment and conditions of operation that will be detrimental to any persons, property, or the general welfare by reasons of excessive production of traffic, noise, smoke, fumes, glare or odors."[28] When reviewing this criterion, the hearing examiner first noted that the "crux of the conditional use criteria are aimed at direct, potential adverse impacts from a proposal." He then announced:

> "[T]his Examiner considers the additional traffic, which will result from residential development from parcels which cannot now be developed because of the sewer moratorium, to be impacts from previous land use decisions and not impacts from construction of this sewer. In fact, the sewer is a public service owed to the property owners, as a result of previous decisions by Whatcom County to allow subdivision of properties within the service area."

The examiner also determined that the "only direct impacts from the proposed sewer line will be those resulting during the construction phase."

We agree with the examiner's approach. Any traffic increase associated with approval of the CUP was not caused by approving the second interceptor itself, but rather by the development approved long ago when the lots served by the sewer system were platted. Further, the examiner had no duty to deny the CUP because it could potentially allow future development not already approved.

[27] This argument challenges the examiner's interpretation of one of the CUP criteria in the Whatcom County Code. Thus, although WDF and Wells cite the "clearly erroneous application of the law to the facts" standard for granting relief under LUPA, *see* RCW 36.70C.130(1)(d), the more appropriate LUPA standard for relief is RCW 36.70C.130(1)(b), which asks whether "[t]he land use decision is an erroneous interpretation of the law, after allowing for such deference as is due the construction of a law by a local jurisdiction with expertise."

[28] WCC 20.84.220(6).

Such a decision would be based on hypothetical information and would not provide a legally sufficient ground for denying the CUP. Any impacts of plats or other development that had not been approved at the time of the hearing are properly considered in the context of those later applications.[29]

Finally, although Wells and WDF repeatedly claim in their briefs that the hearing examiner's approval of the permit was not supported by substantial evidence and his application of the law to the facts was clearly erroneous,[30] they do not address these contentions specifically and we therefore do not evaluate them.[31]

We affirm the examiner's decision approving the CUP, reverse the trial court's order remanding for preparation of an SEIS and further agency review of the project, and grant the District's motion to strike portions of WDF's response and reply briefs and for $500 in sanctions.

GROSSE and ELLINGTON, JJ., concur.

---

[29] WDF's and Wells' claim that our review of the examiner's treatment of traffic impacts necessitates consideration of whether SEPA supplements the local code to require consideration of indirect impacts is therefore irrelevant.

[30] *See* RCW 36C.70C.130(1)(c) and (d).

[31] Wells does address the substantial evidence and clearly erroneous standards in her brief but supports her substantive contentions with nothing more than a few conclusory allegations and no citations to the record, despite the fact that she has the burden on appeal of establishing that one or more of LUPA's standards of review has been met. *See* RCW 36.70C.130(1). This is insufficient for appellate review. *See J-U-B Eng'rs v. Routsen*, 69 Wn. App. 148, 152, 848 P.2d 733 (1993).