# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| NISQUALLY DELTA ASSOCIATION, | No. 54893-3-II |
| Respondent, | |
| v. | |
| CITY OF DUPONT, | UNPUBLISHED OPINION |
| Respondent, | |
| DUPONT INDUSTRIAL PARTNERS, LLC, | |
| Appellant. | |

CRUSER, P.J. — DuPont Industrial Partners LLC (the Partners) sought a permit from the city of DuPont to build a warehouse on their property, which is located on historic land. After review pursuant to the State Environmental Policy Act (SEPA), ch. 43.21C RCW, the city initially recommended approval of the proposal and issued a mitigated determination of nonsignificance (MDNS). Nisqually Delta Association (the Association) challenged both the permit and the MDNS, and the case was heard before a city hearing examiner. The hearing examiner denied the permit but approved the MDNS. The Association and the Partners cross-appealed the hearing examiner's decision to the superior court, which affirmed the denial of the permit but reversed the examiner's decision on the MDNS. The Partners appeal the invalidation of the MDNS.

No. 54893-3-II

Pursuant to this court's General Order 2010-1,[1] the Association was responsible for opening briefing and oral argument on appeal. The Association asserts that (1) the Partners' failure to appeal the permit denial deprives this court of jurisdiction to hear the MDNS appeal; (2) the hearing examiner erroneously applied the DuPont Municipal Code protecting the historic land; (3) the hearing examiner erred in its analysis of the National Historic Preservation Act, Pub. L. No. 89–665, 80 Stat. 915 (1966); the hearing examiner erred in limiting the SEPA issues that the Association raised at the hearing; (5) the MDNS is clearly erroneous; and (6) the Association is entitled to attorney fees on appeal.

We hold that this court does not have jurisdiction to hear the MDNS appeal. Accordingly, we dismiss the Partners' appeal. We also award attorney fees to the Association.

FACTS

A. Historical Significance of the Property

The Partners sought approval from the city of DuPont for the construction of a warehouse. The land on which the Partners wished to build their warehouse is known as Lot Y. This land is within the traditional territory of local Indigenous peoples, such as the Nisqually Tribe and the Puyallup Tribe. The area is rich in historical significance, including, relevant to this appeal, the Methodist Episcopal Mission site (the Mission site).

The Mission site once held the first American settlement on Puget Sound. In 1834, the Mission and its school were founded to convert the local Indigenous communities to Christianity. The Mission buildings were constructed in 1839, and missionary services began in 1840. The site

---

[1] Gen. Order 2010–1 of Division II, *In Re: Modified Procedures For Appeals Under The Administrative Procedures Act, Chapter 34.05, and Appeals Under the Land Use Petition Act, Chapter 36.70C RCW* (Wash. Ct. App.), https://www.courts.wa.gov/appellate_trial_courts/.

held several historic events within the region, such as the first Independence Day celebration, the first wedding of U.S. citizens, and the first U.S. child born. Ultimately, "[t]he Mission was not successful, was abandoned in 1842, and later destroyed by fire." Clerk's Papers (CP) at 984. American settlers at the Mission site continued to use the land for agriculture. The Mission site was commemorated with a historical marker in the 1920s.

In 1904, the 9th U.S. Cavalry Buffalo Soldiers bivouacked in the area for three months, where they trained and practiced mock battles. The 9th U.S. Cavalry was an all-Black regiment and was one "of the most highly decorated units in American military history." CP at 2312. The soldiers joined five other units, leading to "the largest military gathering on the West Coast up to that time" and the creation of present-day Joint Base Lewis-McChord. *Id.* at 1881. The Mission site was in the middle of the campground.

B. Subsequent Land Ownership and Proposed Warehouse Development

In 1906, the DuPont Company established the DuPont Powder Works on the land containing these sites. The DuPont facilities included an explosives manufacturing plant, a company town, docks along the shoreline, and a railroad. There was "extensive land disturbance" caused by the construction and demolition of buildings, construction of roads and the railroad, and frequent explosions.[2] *Id.* at 975. DuPont Powder Works closed in 1976, and the property was purchased by the Weyerhaeuser Company.

Weyerhaeuser entered into several agreements for development on the property, including a "Memorandum of Agreement" with the city, the Association, and other citizen groups that

---

[2] It is not clear exactly when, but the historical marker was removed from the Mission site at one point and placed in a warehouse "for its protection." CP at 2079. It was returned to the site sometime later.

wanted to preserve portions of the property and form a historic district. Under this agreement, the Weyerhaeuser Real Estate Company would support the listing of the property in the National Register of Historic Places on certain conditions, including the ability to develop on "all developable portions of the Property." *Id.* at 2494. The agreement also provided an option for the Nisqually Point Defense Fund to purchase the Mission site and an Interpretive Center Site, though certain details were left to be determined, such as "actual location of sites and size." *Id.* The agreement was incorporated by reference into the "City of DuPont Comprehensive Plan" as encouraging "identification, protection, preservation and or restoration of cultural resource sites of documented significance." *Id.* at 3768. Apparently, this purchase never took place, and the Partners now own the parcel of land containing Lot Y.

The Partners' project proposal included a dedication of land and a right of way for the city to develop a commemorative area open to the public and visible from the Sequalitchew Creek Trail. This area would include commemorative signage, benches along the trail, and a replica Methodist Mission schoolhouse. In addition, the marker commemorating the Mission site would be relocated into the historical commemorative area "where it can be easily viewed from the trail." *Id.* at 2281.

The Partners retained Parus Consulting, Inc. to conduct an archaeological survey to provide "cultural clearance" for the area of proposed development (the Parus Report). *Id.* at 970. The Parus Report concluded that "the potential for discovery of buried archaeological materials, features or deposits by implementation of this project is considered low." *Id.* at 1002.

The city of DuPont recommended approval of the permit and issued an MDNS outlining the commemorative area.

C. Hearing and Examiner's Decision

The Association challenged both the permit approval and the MDNS. At the hearing, several archaeologists testified as to the accuracy of the marker identifying the Mission site. Guy Moura discussed that, in 1989, he found brick fragments near the marker, which he believed to be from the chimney from the Mission schoolhouse. Based on this finding, Moura concluded that the marker established an accurate location of the Mission site. Dimitra Zalarvis-Chase testified for the Partners. Based on her reading of the Parus Report and the lack of evidence at the sites, she concluded that the marker may not accurately locate the Mission site. "Ms. [Zalarvis]-Chase noted that the site had already been exhaustively excavated meaning that the materials, even if they were there, would already be so seriously diminished that they would not offer significant historical resources." *Id.* at 29-30.

The hearing examiner concluded that "[t]he proposal will not create significant adverse impacts to cultural/historical resources." *Id.* at 27. This was based on the examiner's conclusion of law regarding DuPont Municipal Code (DMC) 25.80.030, which prohibits structures within 50 feet of historical markers. The hearing examiner explained that DMC 25.80.030 was "ambiguous as to whether and where a marker can be relocated," and the examiner ultimately concluded that the provision allowed for the relocation of the marker. *Id.* at 38.

However, the hearing examiner denied the Partners' permit request due to violation of a different code provision that prohibited a warehouse from abutting a main road. *Id.* at 17 ("Beyond the compliance problem with DMC 25.45.030(17), the project otherwise complies with all applicable development standards and would be approved."). The city issued a notice of decision based on the hearing examiner's decision. The City indicated that the permit was "**denied** because

the proposed warehouse use abuts a main road." *Id.* at 14. However, "the SEPA MDNS issued by the City is **sustained** subject to revisions . . . as provided in the decision." *Id.*

D. Appeal

The Association and the Partners cross-appealed the hearing examiner's decision to the Pierce County Superior Court. The superior court affirmed the denial of the permit and reversed the MDNS decision, stating:

> The Hearing Examiner's affirmance of the City of DuPont's "mitigated determination of non-significance" under SEPA (the MDNS) was based in part on an incorrect interpretation of DMC 25.80.030. DMC 25.80.030 protects the designated cultural resources site identified as the "Site of Methodist/Episcopal Mission" in DMC 25.80.020(1)(c). That site is identified by the current location of the Mission Marker. Accordingly, the MDNS relies on an error of law and clearly erroneous application of law to facts. The MDNS is INVALIDATED and with respect to this issue only the appeal of Nisqually Delta Association is GRANTED.

*Id.* at 4409. This is the only portion of the superior court order that the Partners appealed.

DISCUSSION

I. STANDARD OF REVIEW

A. SEPA

"Under SEPA, before a local government processes a permit application for a private land use project, it must make a 'threshold determination' of whether the project is a 'major action significantly affecting the quality of the environment.' " *Anderson v. Pierce County*, 86 Wn. App. 290, 300-01, 936 P.2d 432 (1997) (quoting RCW 43.21C.030(2)(c)). When determining whether a proposal will significantly impact the quality of the environment, the SEPA responsible official shall take into account whether the proposal "[c]onflict[s] with local, state, or federal laws or requirements for the protection of the environment." WAC 197-11-330(3)(e)(iii). If the proposal is " 'likely to have a probable significant adverse environmental impact,' " the SEPA responsible

official issues a determination of significance and an environmental impact statement must be prepared. *Anderson*, 86 Wn. App. at 301 (quoting WAC 197-11-330(1)(b)). An environmental impact statement is not required when a determination of non-significance is issued. *Id.*

An MDNS "involves changing or conditioning a project to eliminate its significant adverse environmental impacts." *Id.*; WAC 197-11-350. An MDNS is reviewed under the clearly erroneous standard. *Anderson*, 86 Wn. App. at 302. "A finding is 'clearly erroneous' when, although there is evidence to support it, the reviewing court on the record is left with the definite and firm conviction that a mistake has been committed." *Id.*

B. LUPA

LUPA governs judicial review of land use decisions. Ch. 36.70C RCW; *Wells v. Whatcom County Water Dist. No. 10*, 105 Wn. App. 143, 149, 19 P.3d 453 (2001). "We stand in the shoes of the superior court and review the hearing examiner's action de novo on the basis of the administrative record." *Wells*, 105 Wn. App. at 150. The party seeking relief must establish that at least one of the standards listed in RCW 36.70C.130(1) has been met. RCW 36.70C.130(1); *Wells*, 105 Wn. App. at 149.

"Under LUPA a court reviews the decision to issue an MDNS under any one of the six standards set forth in RCW 36.70C.130(1)." *Wenatchee Sportsmen Ass'n v. Chelan County*, 141 Wn.2d 169, 176, 4 P.3d 123 (2000). Where, as here, the issue before the court is the proper interpretation of the law, the standard is whether the interpretation was erroneous. RCW 36.70C.130(1)(b).

## II. SEPA's LINKAGE REQUIREMENT

The Association argues that the Partners' failure to appeal the underlying government action—the denial of the permit—deprives this court of jurisdiction to hear the SEPA appeal. We agree.

### A. LEGAL PRINCIPLES

RCW 43.21C.075(6)(c) states, "Judicial review under this chapter shall without exception be of the governmental action together with its accompanying environmental determinations." This is known as SEPA's linkage requirement, and it stands for the proposition that there must be a final agency decision before a court may review an environmental determination. *Int'l Longshore and Warehouse Union, Local 19 v. City of Seattle*, 176 Wn. App. 512, 519, 309 P.3d 654 (2013) ("This means that until an agency has taken final action on a proposal, judicial review of an agency's compliance with SEPA may not occur."); *State ex rel. Friend & Rikalo Contractor v. Grays Harbor County*, 122 Wn.2d 244, 250-51, 857 P.2d 1039 (1993).

Washington courts have previously turned to Professor Richard Settle, "a recognized authority on SEPA," for guidance on this rule as it relates to timing for appeals under RCW 43.21C.075. *Waterford Place Condo. Ass'n v. City of Seattle*, 58 Wn. App. 39, 45, 791 P.2d 908 (1990); *see also Grays Harbor County*, 122 Wn.2d at 250-51. Professor Settle has previously explained that "the purposes of the linkage requirement are to: preclude judicial review of SEPA compliance before an agency has taken final action on a proposal, foreclose multiple lawsuits challenging a single agency action[,] and deny the existence of 'orphan' SEPA claims unrelated to any government action." *Grays Harbor County*, 122 Wn.2d at 251.

B. ANALYSIS

The Association argues that we cannot hear the Partners' appeal because the Partners are only challenging the SEPA determination and not the permit denial. Although the facts of this case are unique, *Boss v. Department of Transportation*, 113 Wn. App. 543, 54 P.3d 207 (2002), is illustrative. *Boss* involved the development of a new Tacoma Narrows Bridge. *Boss*, 113 Wn. App. at 546. Boss, the appellant, filed a SEPA challenge to the adequacy of the environmental impact statement for the project and its lack of mitigation measures. *Id.* at 547. The superior court dismissed Boss' petition on summary judgment in part because Boss did not challenge the underlying governmental action, the approval of the bridge project. *Id.* On appeal to this court, the Department of Transportation again argued Boss' challenge should be dismissed because his failure to challenge the underlying governmental action did not comply with RCW 43.21C.075. *Id.* at 548.

We held that because the Department of Transportation based its project approval on the environmental impact statement, Boss' challenge to the environmental review was, in effect, a challenge to the project approval. *Id.* at 550. That is, a ruling in Boss' favor on the environmental impact statement would have defeated the entire project approval. Thus, we held that Boss did, in fact, challenge the underlying government action. We emphasized that appeals under RCW 43.21C.075 " 'must combine review of SEPA issues with the related government action.' " *Id.* at 549 (quoting *Grays Harbor County*, 122 Wn.2d at 249).

Conversely, the appeal of the SEPA decision in this case—the decision which allowed the moving of the marker—is not linked to the underlying government action. This is not only because the Partners did not appeal the denial of the permit, but also because the permit was denied for an

entirely different reason than the issue they raise on appeal: the warehouse abutted a main road in violation of DMC 25.45.030(17). Regardless of what we decide, the Partners still cannot obtain a permit based on the MDNS before us. Therefore, an appeal of the SEPA issue here is an "orphan" SEPA claim unrelated to a government action. *See Grays Harbor County*, 122 Wn.2d at 251.

The Partners assert that this is the only opportunity they have to appeal the marker issue because SEPA review materials "carry on" to future projects on the same site. Br. of the Partners at 32. However, "before a local government processes a permit application for a private land use project, it must make a 'threshold determination' " of whether the project will significantly affect the quality of the environment. *Anderson*, 86 Wn. App. at 300-01 (quoting RCW 43.21C.030(2)(c)). This determination is required for any proposal constituting an "action" (as

defined in WAC 197-11-704), unless the proposal is categorically exempt or when an agency is acting on the "same proposal." WAC 197-11-310(1),[3] WAC 197-11-600(3).[4]

The Partners do not demonstrate that any new proposal they submit will necessarily be deemed the "same proposal." Here, any new proposal submitted by the Partners will require the warehouse to be placed in such a way that it does not abut a main road, which means that its location, even if only slightly, will differ. In fact, at oral argument, the Partners indicated that they had already submitted a new proposal to comply with DMC 25.45.030(17). Therefore, the exception for the "same proposal" does not apply. Under WAC 197-11-310, the city must make a determination regarding the impacts of the new proposal. The city is "authorized" to use prior environmental documents "in whole or in part" if the documents adequately address the relevant environmental considerations. RCW 43.21C.034; *see also* WAC 197-11-600(4) (providing for adopting an existing environmental document or incorporating it by reference). And "[a]n agency *may* use environmental documents that have been previously prepared in order to evaluate proposed actions, alternatives, or environmental impacts," whether the proposals are the same or different. WAC 197-11-600(2) (emphasis added). But nothing in these regulations *requires* the city to use the same MDNS for a new proposal after a failed project.

The Partners argue, in passing, that "principles of res judicata and/or collateral estoppel" would prevent them from appealing the marker issue in the future, with no further discussion or

---

[3] WAC 197-11-310(1) provides:

A threshold determination is required for any proposal which meets the definition of action and is not categorically exempt, subject to the limitations in WAC 197-11-600(3) concerning proposals for which a threshold determination has already been issued, or statutorily exempt as provided in chapter 43.21C RCW. A threshold determination is not required for a planned action (refer to WAC 197-11-164 through 197-11-172).

No. 54893-3-II

[4] WAC 197-11-600 provides:

(1) This section contains criteria for determining whether an environmental document must be used unchanged and describes when existing documents may be used to meet all or part of an agency's responsibilities under SEPA.

(2) An agency may use environmental documents that have previously been prepared in order to evaluate proposed actions, alternatives, or environmental impacts. The proposals may be the same as, or different than, those analyzed in the existing documents.

(3) An agency acting on the same proposal shall use an environmental document unchanged, except in the following cases:

(a) For DNSs, . . .

(b) For DNSs and EISs, . . .

 . . . .

(c) For EISs, . . .

(4) Existing documents may be used for a proposal by employing one or more of the following methods:

(a) "Adoption," where an agency may use all or part of an existing environmental document to meet its responsibilities under SEPA. Agencies acting on the same proposal for which an environmental document was prepared are not required to adopt the document; or

(b) "Incorporation by reference," where an agency preparing an environmental document includes all or part of an existing document by reference.

(c) An addendum, that adds analyses or information about a proposal but does not substantially change the analysis of significant impacts and alternatives in the existing environmental document.

(d) Preparation of an SEIS if there are:

(i) Substantial changes so that the proposal is likely to have significant adverse environmental impacts; or

(ii) New information indicating a proposal's probable significant adverse environmental impacts.

(e) If a proposal is substantially similar to one covered in an existing EIS, that EIS may be adopted; additional information may be provided in an addendum or SEIS (see (c) and (d) of this subsection).

citation to legal authority. Br. of the Partners at 32-33. However, "[p]assing treatment of an issue or lack of reasoned argument" does not merit our consideration. *Holland v. City of Tacoma*, 90 Wn. App. 533, 538, 954 P.2d 290 (1998). Accordingly, we do not address this argument.[5]

The Partners also argue that the marker issue is not "merely a SEPA question" because their proposal is required to meet city code requirements as part of the city's normal review process. Br. of the Partners at 30-31. However, the issue before us, which relates solely to the historical marker issue, comes directly from the MDNS and presents a question under SEPA. *See, e.g.*, CP at 4402 ("The Hearing Examiner's affirmance of the City of DuPont's 'mitigated determination of non-significance' under SEPA (the MDNS) was based in part on an incorrect interpretation of DMC 25.80.030."). A decision from us whether to affirm or reverse the decision of the superior court regarding the marker would, therefore, apply directly to the MDNS, a SEPA issue. As a result, although the Partners may be correct in that their appeal presents more than a SEPA question, we cannot separate the issue to avoid this jurisdictional barrier.

We hold that RCW 43.21C.075(6)(c) precludes our review of the Partners' appeal.

ATTORNEY FEES

The Association requests attorney fees under RCW 4.84.370, which provides for an award of attorney fees and costs to the prevailing party in an appeal of a land use decision. We hold that the Association is entitled to attorney fees.

---

[5] In the event that the Association attempts to bind the Partners to the superior court's ruling on the marker, nothing in this opinion affects the ability of a party to make any available equitable arguments in future proceedings. *See, e.g.*, *Kucera v. Dep't of Transp.*, 140 Wn.2d 200, 224, 995 P.2d 63 (2000) ("As SEPA itself contemplates the balancing of economic and environmental factors, a trial court too must apply traditional equitable principles and weigh competing interests when asked to enjoin a challenged action.").

No. 54893-3-II

A. LEGAL PRINCIPLES

RCW 4.84.370(1) provides that a prevailing party on appeal of a land use decision by a county or city shall be awarded attorney fees and costs if "(a) The prevailing party on appeal was the prevailing or substantially prevailing party before the county, city, or town . . . ; and (b) The prevailing party on appeal was the prevailing party or substantially prevailing party in all prior judicial proceedings." A party need not prevail on the entire claim; they must simply "succeed in some manner to 'prevail.' This includes jurisdictional wins." *Durland v. San Juan County*, 182 Wn.2d 55, 78, 340 P.3d 191 (2014).

B. ANALYSIS

At the city level, although the MDNS was approved, the Partners' permit was denied. Because a party need not prevail on its entire claim, the Association was the substantially prevailing party before the hearing examiner. In addition, the Association was the prevailing party before the superior court. Before us, the Association has prevailed on the jurisdictional issue under RCW 43.21C.075.

Because the Association prevailed before the city, the superior court, and this court, it is entitled to attorney fees under RCW 4.84.370(1) in an amount to be determined by the court commissioner.

CONCLUSION

We hold that RCW 43.21C.075(6)(c) deprives this court of jurisdiction to hear the Partners' appeal of the superior court's decision. Accordingly, we dismiss the Partners' appeal. We also hold that the Association is entitled to attorney fees in an amount to be determined by the court commissioner.

14

No. 54893-3-II

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

CRUSER, P.J.

We concur:

VELJACIC, J.

PRICE, J.