# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

CITIZENS TO STOP THE SR 169
ASPHALT PLANT,

                    Appellant,

        v.

KING COUNTY; LAKESIDE INDUSTRIES
INC.,

                    Respondents.

No. 85566-2-I
(Consolidated w/85567-1)

DIVISION ONE

UNPUBLISHED OPINION

FELDMAN, J. — This appeal stems from an asphalt plant construction project (the Project) proposed by Lakeside Industries Inc. (Lakeside). The Project includes both construction of an asphalt plant on property located adjacent to State Road 169 in unincorporated King County and road improvements to support the plant. Because the road improvements are less than 200 feet from the shoreline of the Cedar River, the improvements triggered review under the Shoreline Management Act (SMA). Lakeside therefore applied for a construction permit for the asphalt plant, a substantial shoreline development permit (SSDP) for the road improvements, and a combined mitigated determination of nonsignificance (MDNS) for both—as required by the State Environmental Policy Act (SEPA). Following public notice and comment, the King County Department of Local Services (County) issued both permits and the combined MDNS.

Citizens to Stop the SR 169 Asphalt Plant (Citizens) opposes the Project. To that end, it filed a petition for review appealing the SSDP and combined MDNS to the Shoreline Hearings Board (Board) and a petition under the Land Use Petition Act (LUPA petition) appealing the construction permit and combined MDNS to King County Superior Court. The superior court stayed the LUPA petition pending the Board's Decision. After the Board issued its findings of fact, conclusions of law, and order (the Board's Decision) affirming the County's decision to issue the SSDP and combined MDNS, Citizens appealed the Decision to the superior court, which consolidated the appeal with the LUPA petition and transferred the consolidated appeal to this court.

We hold that the Board properly exercised "sole jurisdiction" under SEPA when it upheld the County's combined MDNS and therefore dismiss Citizens' LUPA petition, which exclusively raises arguments under SEPA. We further hold that Citizens has not met its burden under the Administrative Procedures Act (APA) to demonstrate the invalidity of the Board's Decision, including its order affirming the County's combined MDNS and SSDP. We affirm.

I

Lakeside is a family-owned business with approximately 700 employees and 16 asphalt plants in Washington and Oregon. Lakeside proposed to relocate its asphalt plant located in Covington, Washington to the property located at 18825 SE Renton-Maple Valley Road (SR 169) in unincorporated King County. Due to the site's location in relation to the Cedar River, the corresponding road

improvements triggered review under the SMA and required an SSDP.[1]  A construction permit was also required for the asphalt plant itself.[2]

Lakeside applied for the construction permit and SSDP on November 8, 2018.  There being substantial interest in the Project, the County received and reviewed over 300 public comments.  On April 14, 2022, the County found that the proposal "does not pose a probable significant adverse impact to the environment provided the mitigation measures are applied as conditions of permit issuance."  Accordingly, as required by SEPA, the County issued its threshold determination: an MDNS for the two permits.  As a condition of issuing the two permits, the corresponding combined MDNS required Lakeside to take mitigating measures to protect cultural resources, air quality, soil, noise, critical areas, and ground and surface water.

After the County issued the two permits and combined MDNS for the Project, Citizens filed two appeals.  First, Citizens filed a petition for review appealing the SSDP and combined MDNS to the Board.  Second, Citizens filed a LUPA petition appealing the construction permit and combined MDNS to King

---

[1] The SSDP describes the permitted project to include:  "The proposed development within shoreline jurisdiction will widen State Highway SR 169, and relocate the access to a proposed Asphalt Plant.  The Highway improvements will specifically add a deceleration and acceleration lane to the State Highway SR 169, and will be made to Washington State Department of Transportation (WSDOT) standards. The existing Highway drainage ditch will be relocated, a utility pole will be relocated, a stop sign will be added, a guardrail will be added and landscaping will be added. The Highway drainage ditches will be vegetated to improve water quality. The drainage from the westerly Highway drainage ditch will be conveyed to a treatment and infiltration facility on the adjacent Lakeside property."

[2] The construction permit describes the permitted project to include:  "Installation of hot mix asphalt plant equipment with permanent structures.  Equipment includes aggregate sorting drying and mixing equipment, air emissions control equipment, storage silos and petroleum storage tanks. Buildings include silo foundations, concrete secondary containment structure, covered aggregate storage bins, facility administration office, sound walls, and below grade stormwater detention vault."

County Superior Court. In Citizens' petition for review, it argued that the County's decision to issue the SSDP violated the Shoreline Master Program (SMP) and the SMA and that the MDNS violated SEPA, and it requested that the Board void the SSDP on those bases. Similarly, Citizens' LUPA petition alleged that the MDNS was issued without sufficient information to evaluate certain environmental impacts and that the court should therefore reverse the MDNS and void the building permit.

Citizens then moved to stay the proceedings in the superior court "pending resolution of the matter involving the same legal issues and the same parties" before the Board. After the superior court denied Citizens' motion, the Board directed the parties to brief the issue of whether the Board "should review evidence pertaining to the entire MDNS or only the portions of the MDNS that cover activities permitted in the" SSDP. After considering briefing of all parties, the Board decided that to limit the review of the MDNS to evidence related to impacts solely to the shoreline jurisdiction, even if that were possible, "would constitute impermissible piecemealing of the project and fail to consider the cumulative impacts in contravention" of the controlling "rules, statutes, and case law." The Board acknowledged, "This conclusion may result in presenting the same evidence related to the plant's alleged impacts before the Board and King County Superior Court in the LUPA appeal." It nevertheless concluded, "The Board maintains comprehensive scope of review under SEPA."

Following a 10-day hearing before the Board, the parties stipulated to a stay of proceedings in superior court to await the Board's Decision. The Board thereafter issued its Decision affirming the County's SSDP and combined MDNS.

Citizens then filed a petition for review appealing the Decision to superior court, and the parties filed a stipulated motion to consolidate the petition for review and the LUPA petition and transfer the consolidated appeal for direct review by this court. The superior court granted the stipulated motion.

II

Citizens challenges both the County's decision issuing the combined MDNS and the Board's Decision affirming the MDNS. Our review of these arguments is governed by two principal statutes. First, the APA governs this court's review of the Board's Decision. *Bellevue Farm Owners Ass'n v. Shorelines Hr'gs Bd.*, 100 Wn. App. 341, 362, 997 P.2d 380 (2000). Under the APA, we review the Board's Decision, not the decision of the local government or the superior court, limiting our review to the record before the Board. *May v. Robertson*, 153 Wn. App. 57, 72-73, 218 P.3d 211 (2009). The burden of demonstrating the invalidity of an agency action is on the party asserting invalidity. RCW 34.05.570(1)(a). A party may challenge an agency decision on nine different bases, three of which are at issue here: (1) erroneous interpretation or application of the law, (2) lack of substantial evidence, and (3) the order is arbitrary or capricious. RCW 34.05.570(3)(d),(e),(i). While we accord deference to an agency interpretation of the law where the agency has specialized expertise in dealing with such issues, we are not bound by an agency's interpretation of a statute. *Pres. Our Islands v. Shorelines Hr'gs Bd.*, 133 Wn. App. 503, 515, 137 P.3d 31 (2006).

Second, our review here is also governed by SEPA. The legislature enacted SEPA in 1971, expressing the aim of injecting environmental awareness

into governmental decision-making. *Wild Fish Conservancy v. Wash. Dep't of Fish and Wildlife*, 198 Wn.2d 846, 855, 502 P.3d 359 (2022). A threshold determination is required for any proposal "which meets the definition of action and is not categorically exempt." WAC 197-11-310. "The lead agency shall prepare its threshold determination . . . at the earliest possible point in the planning and decision-making process, when the principal features of a proposal and its environmental impacts can be reasonably identified." WAC 197-11-055(2). The responsible official shall review an environmental checklist when making its threshold determination. WAC 197-11-315(1). All threshold determinations shall be documented in a determination of significance (DS), a determination of nonsignificance (DNS), or a mitigated determination of nonsignificance (MDNS). WAC 197-11-310; WAC 197-11-350.

When making this threshold determination, the agency must determine whether the proposal will have a probable, significant adverse impact on the environment. WAC 197-11-330(5). A "significant" impact means a "reasonable likelihood" exists that the proposal will have "more than a moderate adverse impact on environmental quality." WAC 197-11-794. The definition of "significant" also states: "The severity of an impact should be weighed along with the likelihood of its occurrence. An impact may be significant if its chance of occurrence is not great, but the resulting environmental impact would be severe if it occurred." WAC 197-11-794(2). "Several marginal impacts when considered together may result in a significant adverse impact." WAC 197-11-330(3)(c).

The threshold determination directly affects whether an Environmental

Impact Statement (EIS) is required. "If the responsible official determines that a proposal may have a probable significant adverse environmental impact, the responsible official shall prepare and issue a [DS]" and an EIS is required. WAC 197-11-360. If the responsible official determines there will be no probable significant adverse environmental impacts from a proposal, the lead agency shall issue a DNS and no EIS is required. WAC 197-11-340. In the alternative, an agency may issue a mitigated DNS, or MDNS, "when the proposal can be conditioned to have no probable, significant adverse impacts by imposing specific mitigation measures." *Wild Fish Conservancy*, 198 Wn.2d at 856 (citing WAC 197-11-350). "The requirement of an EIS may be 'superseded by the MDNS.'" *Id.* at 857 (quoting *Anderson v. Pierce County*, 86 Wn. App. 290, 305, 936 P.2d 432 (1997)).

Although this Court reviews the Board's Decision and not that of the County under the APA, we must also consider the County's analysis because Citizens is challenging the Board's Decision affirming the County's issuance of a combined MDNS for both permits. The County's decision to issue an MDNS and not require an EIS is reviewed under the "clearly erroneous" standard of review. *Id.* at 866. Similarly, in accordance with RCW 43.21C.090, "[a]n agency's decision to issue a MDNS and not to require an EIS must be accorded substantial weight." *Anderson v. Pierce County*, 86 Wn. App. 290, 302, 936 P.2d 432 (1997) (citing RCW 43.21C.090; *Indian Trail Prop. Owner's Assoc. v. City of Spokane,* 76 Wn. App. 430, 442, 886 P.2d 209 (1994)).

"For the MDNS to survive judicial scrutiny, the record must demonstrate that

environmental factors were considered in a manner sufficient to amount to prima facie compliance with the procedural requirements of SEPA, and that the decision to issue an MDNS was based on information sufficient to evaluate the proposal's environmental impact." *Moss v. City of Bellingham,* 109 Wn. App. 6, 23, 31 P.3d 703 (2001). "We look beyond whether substantial evidence exists to support the agency's decision. Rather, we review the entire record and determine whether, based on the entirety of the evidence, we are 'left with the definite and firm conviction that a mistake has been committed.'" *Wild Fish Conservancy*, 198 Wn.2d at 866 (quoting *PT Air Watchers v. Dep't of Ecology*, 179 Wn.2d 919, 926, 319 P.3d 23 (2014)).

A

Citizens' lead argument is that the County violated WAC 197-11-055(2), which states that "[t]he lead agency shall prepare its threshold determination . . . at the earliest possible point in the planning and decision-making process, when the principal features of a proposal and its environmental impacts can be reasonably identified." Here, according to Citizens, the County "did not issue its MDNS until . . . 3 ½ years after the permit applications were filed. This constituted a violation of SEPA."

While 3 ½ years is a substantial amount of time to issue an MDNS, it is not inexplicable. As the County and Lakeside note, SEPA's regulations anticipate a process where an applicant can "revise the environmental checklist as may be necessary to describe" clarifications or changes to a proposal. WAC 197-11-350(2). The regulations further provide "if the lead agency specifies mitigation

measures on an applicant's proposal that would allow it to issue a DNS, and the proposal is clarified, changed, or conditioned to include those measures, the lead agency shall issue a DNS." WAC 197-11-350(3). In appropriate cases, this process can be time-consuming.

Because of these competing interests—issuing a threshold determination "at the earliest possible point," on the one hand, and examining appropriate mitigation measures, on the other—it may be difficult to determine whether an agency prepared its threshold determination "at the earliest possible point in the planning and decision-making process, when the principal features of a proposal and its environmental impacts can be reasonably identified." WAC 197-11-055(2). Nor is it clear what remedy a court can provide, ex post, when an advocate claims that an agency unreasonably delayed its threshold determination. It makes little sense, for example, to remand this matter to the agency to issue the MDNS more expeditiously. Such a "remedy" would cause additional delay, which is contrary to the plain language of WAC 197-11-055(2).

But we need not—and do not—answer these questions here because, as the County and Lakeside correctly argue, Citizens abandoned this argument before the Board and has therefore waived it. Although Citizens raised the timing issue in its initial petition for review, it failed to include the issue in its proposed list of legal issues to the Board. Nor was the issue included in the joint list of proposed legal issues to the Board. Consequently, Citizens, Lakeside, and the County did not address the issue in their opening and closing briefs, and the Board did not address the issue in its Decision. Because Citizens failed to adequately raise this

issue before the Board, it may not be raised on appeal. RCW 34.05.554(1) ("Issues not raised before the agency may not be raised on appeal . . . .").[3]

B

Citizens next argues that the County did not adequately assess or mitigate various environmental impacts before it issued the MDNS for the Project. We disagree. After careful review of the administrative record and the concerns raised by Citizens, we conclude that the County evaluated the relevant environmental factors sufficiently to constitute prima facie compliance with SEPA with regard to (1) toxic and hazardous substances, (2) impacts to fish and fish habitat, (3) impacts to wildlife, (4) traffic impacts, (5) noise impacts, (6) recreational and aesthetic impacts, and (7) land use impacts. Therefore, the County's threshold determination was not clearly erroneous as to these potential environmental impacts, which necessarily informs our corresponding analysis of the Board's Decision. *See* part II.D below.[4]

1

The administrative record shows that the County assessed and collected sufficient information regarding the release or potential release of toxic and

---

[3] Citizens argues that it raised the timing issue in its opening statement at the hearing before the Board and in its closing brief. But those portions of the record do not support this assertion. While Citizens may have cited the regulation (WAC 197-11-055) where the "earliest possible point in the planning and decision-making process" language comes from, it never raised an argument asserting that the County's issuance of the MDNS was not made at the "earliest possible point in the planning and decision-making process." Citizens' argument that the timing of the County's issuance of the MDNS "created a three year long closed-door EIS process that excluded the public" is equally unpersuasive. The County received comments by mail, by e-mail, and at numerous public meetings, and both the County and Lakeside considered and responded to such comments. Contrary to Citizens' argument, the record reflects a substantial opportunity for public participation throughout the decision-making process.

[4] We address the County's consideration of potential air impacts separately because, as discussed in part II.C below, Citizens waived this issue by failing to raise it before the Board.

hazardous materials.  The County conditioned Lakeside's Project on its completion of an independent remedial action to clean up hazardous and toxic materials left from historical industrial operations and spills that have occurred on the site.  To do this, Lakeside's environmental consultant, Farallon Consulting Inc. (Farallon), performed a subsurface investigation.  To evaluate the groundwater and soil contamination, Farallon installed 7 monitoring wells and 16 soil test pits.  The investigation identified "four localized areas of shallow petroleum hydrocarbon-contaminated soil . . . exceeding [Model Toxics Control Act (MTCA)] . . . cleanup levels."  The monitoring wells also showed that no contaminated groundwater is leaving the site.

Further, Lakeside's preapplication materials—which were considered by the County—showed Lakeside's above ground storage tanks for hazardous substances will be located on a concrete slab with primary and secondary containment structures in compliance with King County codes.  Eric Ferguson, a hydrogeologist from King County's Water and Land Resources Division, reviewed Farallon's reports and geotechnical documents as well as the Department of Ecology's documentation regarding Lakeside's proposed independent remedial action.  Finally, the County imposed the following mitigation measures to address the release or potential release of hazardous and toxic materials:

- All contaminated soils shall be removed from the site and the excavated site must be backfilled with clean soils.

- The applicant must identify the source(s) for all clean soil. All contaminated soil must be exported to a state approved site for deposit.
    . . . .

- 11 -

- Plant manager shall keep the Spill Prevention & Response Plan updated and on the site for use during emergency. Staff shall be trained for implementation of the plan for any future emergency.

The record thus shows that the County's decision to issue an MDNS was based on sufficient information regarding the potential release of toxic and hazardous materials.

Notwithstanding the above analysis, Citizens argues "[n]o one with expertise in this topic reviewed the potential for toxic and hazardous material releases and/or impacts that could be caused by such releases before the MDNS was issued on behalf of the County." The Board similarly acknowledged, "The County did not have a MTCA expert review materials relating to contamination at the site." But as the Board correctly noted, County hydrogeologist Eric Ferguson reviewed the potential impacts of the Project including Farallon Consulting's documents on remediation and groundwater contamination. In the report, Farallon's investigation of the site (which was reviewed by the County) determined that no contaminated groundwater is leaving the site. All hazardous substances will also be located on a concrete slab with primary and secondary containment structures in compliance with King County codes. Finally, the MDNS included a mitigation measure requiring Lakeside to keep a "Spill Prevention & Response Plan" on site for use during an emergency and "Staff shall be trained for implementation of the plan for any future emergency."

Because our review of the record shows that the County's decision to issue an MDNS was based on information sufficient to evaluate the proposal's environmental impact with regard to the release or potential release of hazardous

- 12 -

substances, we reject Citizens' contrary arguments regarding this potential impact.[5]

2

The administrative record also shows that the County collected and assessed sufficient information regarding the Project's impacts to fish and fish habitat. Lakeside hired an environmental consultant, the Watershed Company, to prepare a Critical Areas Report (CAR) as required by King County Codes. A CAR documents a proposal's impacts to streams, wetlands, and wildlife. Greg Johnston, a fisheries biologist employed by the Watershed Company, provided quality control on the CAR. Johnston made three separate visits to assess the streams on site and the habitat they provided for fish. Johnston also prepared a mitigation plan that included improvements to existing stream buffers on the Project site which have been degraded by historical industrial use. The improvements included "a native revegetation plan, soil preparation, planting native plants, [and] removing any non-native species . . . ." Johnson noted the benefits of these improvements would include the introduction of "terrestrial insects . . . that would provide food for fish." Further, the revegetation would provide shade along the stream to keep the water cool, which is necessary for salmon to survive.

Laura Casey, a senior professional wetland scientist employed by King County, evaluated the CAR completed by the Watershed Company and concluded

---

[5] Citizens argues that the County also erred when "it failed to comply with WAC 197-11-250(4), which provides that, when a soil remedial action under MTCA is part of a development proposal, the procedures in WAC 197-11-256 through WAC 197-11-268 shall be used to combine the procedural requirements of SEPA and MTCA to the extent practicable." Because Citizens did not make this argument below, we decline to address it. RCW 34.05.554(1) ("Issues not raised before the agency may not be raised on appeal . . . .")

that the Project will improve salmon habitat and the Cedar River. As part of her review, Casey assessed Lakeside's application materials relating to streams, wetlands, and shorelines for the Project and also visited the site. And, as detailed in the County's MDNS, a stormwater filtration system will be installed where "[r]unoff from all paved surfaces will be collected and discharged into the new drainage and water quality treatment facility per the [King County Surface Water Design Manual] standards for industrial sites." The record thus shows that the County's decision to issue an MDNS was based on sufficient information regarding the potential impacts to fish and fish habitat.

Notwithstanding the above analysis, Citizens argues that the County "simply did not assess impacts to fish and fish habitat" because Lakeside falsely reported in its SEPA checklist submitted to the County that there are no "threatened or endangered species known to be on or near the site." However, Ty Peterson, the responsible SEPA official for the County, testified before the Board that he did not rely solely on the SEPA checklist to identify threatened and endangered species, but also relied on public comments that the County received for the Project. A variety of fisheries and other advocacy groups submitted comments identifying their concerns associated with potential impacts to threatened and endangered salmon species. As a result, we reject this argument.

Next, Citizens argues that increased lighting on the site will likely result in significant impacts to fish "because light, whether direct, indirect, or skyglow, [is] known to significantly increase predation of fish and alter migration behavior." But the record shows that the County considered and assessed the impacts of light on

- 14 -

fish and fish habitat in the MDNS: "All lights shall be shielded away from the onsite wetland, stream and their buffers forming the wildlife corridor." Accordingly, we reject this argument.

Finally, Citizens argues that "the Project will involve storage and potential release of fuel or pollutants on the site which is hydrologically connected to the Cedar River." But as discussed above, the County considered and assessed the potential release of hazardous and toxic substances. Lakeside's above ground storage tanks will have primary and secondary containment structures, a stormwater filtration system will collect all stormwater runoff from impervious surfaces, and Lakeside will keep a "Spill Prevention & Response Plan" on site.

Because our review of the record shows that the County's decision to issue an MDNS was based on information sufficient to evaluate the proposal's environmental impact with regard to fish and fish habitat, we reject Citizens' contrary arguments regarding this potential impact.

3

The administrative record shows that the County collected and assessed sufficient information regarding the Project's impacts to wildlife. Nell Lund is a senior ecologist and professional wetland scientist at the Watershed Company who assisted in drafting the CAR and aided in mitigation planning. To prepare the report, Lund conducted field work delineating the boundaries of the wetland features, categorizing the wetlands, and classifying the streams using the stream classification criteria under the Washington Administrative Code. Within the report, wildlife habitat networks (or wildlife habitat corridors) were evaluated and

described as contiguous and 165 feet wide in compliance with King County codes. Further, Lund visited the site five times and found no nest sites or priority habitats. As mentioned above, the CAR was considered by County officials before issuing the MDNS. The record thus shows that the County's decision to issue an MDNS was based on sufficient information regarding the Project's potential impacts to wildlife.

Citizens argues that "[t]here is no discussion anywhere about how the Project will impact the wildlife's use of the Wildlife Habitat Network." But Citizens' argument is not supported by the record. The CAR submitted to the County directly discusses impacts to the wildlife habitat network. Further, as mentioned above, the mitigation measures proposed by Lakeside will enhance buffer areas by restoring vegetation and thereby creating improved habitat for wildlife.

Because our review of the record shows that the County's decision to issue an MDNS was based on information sufficient to evaluate the proposal's environmental impact with regard to wildlife, we reject Citizens' contrary arguments regarding this potential impact.

4

The administrative record similarly shows that the County collected and assessed the Project's impacts to traffic. Lakeside's consultant, Transportation Engineering Northwest (TENW), conducted a level 1 Traffic Impact Analysis (TIA), which is a standard requirement for any project in King County. The TIA "evaluated level of service, sight distance, [and] crash history" for the site. TENW submitted the TIA to King County and the Washington State Department of Transportation

(WSDOT) and both agencies reviewed and prepared comments regarding the TIA.

Jeff Schramm is a transportation engineer and "principal and co-owner of [TENW]." He was the "principal engineer and overall project manager for the entire traffic analysis [and has] been involved [with] this project since 2017." Schramm testified before the Board that the increased traffic due to Lakeside's asphalt plant would be insignificant. He explained that Lakeside's activities on the highway would add 212 daily trips to a total of approximately 24,000 daily trucks and cars already using the highway, resulting in an increase of less than one percent. Schramm also explained that he expects to see "daily fluctuation in traffic by up to five percent. So an impact of less than one percent would be within the daily fluctuation of traffic . . . I would not consider that to be significant." The record thus shows that the County's decision to issue an MDNS was based on sufficient information regarding the Project's potential impacts to traffic.

Citizens claims that the "[TIA]'s reliance on historical crash data for the site is imprudent and not representative of the increased risk associated with the proposed operations." However, as part of its Project, Lakeside is adding a deceleration and acceleration lane to the highway and is relocating and widening the access road to improve highway operations and safety.

Because our review of the record shows that the County's decision to issue an MDNS was based on information sufficient to evaluate the proposal's environmental impact with regard to traffic, we reject Citizens' contrary arguments regarding this potential impact.

5

The administrative record also shows that the County collected and assessed sufficient information regarding the Project's noise impacts before issuing the MDNS. Lakeside hired Landau Associates to conduct an environmental noise assessment for the Project. The assessment included coordinating sound level measurements, identifying the relevant noise regulations, constructing and running noise models, analyzing and identifying various noise-mitigation measures, and making a determination on significance of impacts. As mentioned above, Lakeside plans to move its Covington plant (including the same equipment) to the Project site. Part of Landau Associates' assessment included visiting Lakeside's Covington asphalt plant to take noise measurements from the equipment that will eventually be transferred to the Project site. The County hired BRC Acoustics to review Landau Associates' analysis.

The County's SEPA official, Ty Peterson, considered the BRC Acoustics report and noted that while the Project's noise emissions at the north end of the site (48 decibels) exceeded the applicable limit imposed by King County codes (47 decibels), it was not a significant impact under SEPA. Peterson explained that because noise emissions from the highway which sits north of the site was measured at 54 to 63 decibels and the highway noise is "far more consistent than the noise [from Lakeside's proposed] facility operations," the modest noise exceedance "is less concerning."

Further, Kristen Wallace, Lakeside's noise consultant at Landau Associates, testified before the Board and described the noise modeling conducted

for the Project as "conservative and will result in slightly higher noise levels than I . . . really expect to be emitted by this facility." Finally, the County imposed mitigation measures to reduce the level of noise from the facility in the MDNS: "All sound attenuation walls shall be constructed as proposed. Operational mitigation measures referenced in Ramboll US Corporation Report dated June 4, 2020 including restricting use of RAP crushing during nighttime operation shall be followed." The record thus shows that the County's decision to issue an MDNS was based on sufficient information regarding potential noise impacts.

Citizens raises two arguments regarding this issue. First, Citizens argues that Lakeside's noise modeling did not analyze the hourly maximum noise emissions (Lmax) as required by King County Codes and, as a result, the County's analysis of the Project's noise impacts is insufficient. Wallace testified that there is no requirement to model Lmax emissions. Further, she testified that another noise measurement, the energy average sound level (Leq), "is the most difficult noise limit to comply with," and she would expect that if a mitigation measure could reduce Leq to a compliant level, Lmax levels would be "within the compliance limits as well." Second, Citizens argues that "even with the excessively high noise walls of unverified performance, the Project will still exceed noise limits." But as discussed above, the County's SEPA official deemed a one decibel exceedance of the County's noise limits as insignificant under SEPA because of the constant background noise emitted by SR 169.

Because our review of the record shows that the County's decision to issue a MDNS was based on information sufficient to evaluate the proposal's

environmental impact with regard to noise, we reject Citizens' contrary arguments regarding this potential impact.

6

The administrative record similarly shows that the County collected and assessed sufficient information with regard to the Project's recreational and aesthetic impacts. The Project sits on a property that is currently vacant and totals approximately 25 acres. Of the 25 acres, 11.3 will either be developed or be established as a critical buffer area. The existing highway (SR 169) north of the facility separates the proposed asphalt plant from the Cedar River Trail. The Project will not impede public access to the Cedar River Trail or the Cedar River. Further, the site itself does not provide for any recreational activities. Finally, no one's view in the immediate vicinity will be obstructed. The record thus shows that the County's decision to issue an MDNS was based on sufficient information regarding potential recreational and aesthetic impacts.

Citizens argues "[t]he Asphalt Plant will be in the direct view of users of the Cedar River Trail, which runs along the shoreline area and is used and enjoyed heavily by members of the public. It will significantly and adversely impact what is currently scenic wilderness-like panorama by marring it with an industrial facility." But as the Board noted, "[t]he aesthetics of building an asphalt plant on a historically industrial site with tree buffers between the plant and the residential neighborhood is not a significant adverse impact."

Because our review of the record shows that the County's decision to issue an MDNS was based on information sufficient to evaluate the proposal's

- 20 -

environmental impact with regard to recreational and aesthetic interests, we reject Citizens' contrary arguments regarding this potential impact.

7

The administrative record likewise shows that the County evaluated the Project's land use impacts before issuing the MDNS. In considering the Project's potential land use impacts, the County considered the site's land use designation under the County's comprehensive plan, its zoning designation, and the development criteria for that particular zoning designation. The County's land use designation of the site is industrial and is consistent with the County's Comprehensive Plan. The SSDP described the portion of the site that is within the shoreline's jurisdiction as high intensity shoreline. The County also considered numerous public comments that identified potential land use impacts associated with Lakeside's proposal.

Because our review of the record shows that the County's decision to issue a MDNS was based on information sufficient to evaluate the proposal's land use impacts, we reject Citizens' contrary arguments regarding this potential impact.

C

In response to Citizens' argument that the County failed to adequately assess or mitigate the air quality impacts from Lakeside's industrial operations at the site, Lakeside and the County argue that Citizens waived this issue on appeal by failing to raise it before the Board. Because Citizens withdrew this issue before the Board, we agree with Lakeside and the County and conclude that Citizens has

waived this issue on appeal. *See* RCW 34.05.554 ("Issues not raised before the agency may not be raised on appeal . . . .").

Citizens maintains that it may properly raise this argument on appeal because it raised air quality impacts in its LUPA petition, which has been consolidated with its petition for review. The County responds that we should dismiss the consolidated LUPA petition because it only raises SEPA related arguments as to which the Board exercised "sole jurisdiction." The County is correct. The Board's "sole jurisdiction" over SEPA issues comes from SEPA itself:

> In the case of an appeal under this chapter regarding a project or other matter that is also the subject of an appeal to the shorelines hearings board under chapter 90.58 RCW [SMA], the shorelines hearings board shall have sole jurisdiction over both the appeal under this section and the appeal under chapter 90.58 RCW, [and] shall consider them together . . . .

RCW 43.21C.075(7). As this provision plainly states, when a party appeals under both SEPA and the SMA, SEPA requires that the Board have "sole jurisdiction" over both appeals. Thus, we grant the County's motion to dismiss the LUPA appeal because it only raises arguments under SEPA where the Board correctly exercised "sole jurisdiction." It necessarily follows that Citizens lacks any proper vehicle by which to raise its air quality argument in this appeal. As a result, we do not address it here.

D

Turning specifically to the Board's Decision affirming the County's issuance of a combined MDNS for both permits, Citizens challenges the Decision under three provisions of the APA. First, citing RCW 34.05.570(3)(d), Citizens argues that the Board "has erroneously interpreted or applied the law." Citizens is

incorrect.  The Board's Decision properly sets forth the applicable legal standard to review SEPA threshold determinations and properly recounts the information considered by the County in evaluating the Project's environmental impacts. Citizens has not established, nor is there any basis to conclude, that the Board erroneously interpreted or applied the law in affirming the County's MDNS.

Second, citing RCW 34.05.570(3)(e), Citizens argues that the Board's Decision "is not supported by evidence that is substantial when viewed in light of the whole record before the court."  Again, we disagree.  As an initial matter, Citizens does not argue that any of the following findings of the Board are unsupported by substantial evidence:  1-18, 20-44, 46-54, 56-118, 120-131, 135-36, 138, 140, 142-43, 145-50, 152, 155, and 157-224.  As a result, these findings are verities on appeal.  *State v. Grocery Mfrs. Ass'n*, 198 Wn.2d 888, 901, 502 P.3d 806 (2022) ("Since GMA did not challenge this finding, it is a verity on appeal.").  Citizens also does not challenge conclusions of law 1-5, 7, 9-24, 27, 30, 31, 33, 36, 39-55, 60, 63-66, 69, 70, and 75-78.  As a result, they are law of the case.  *Matter of Marriage of Laidlaw*, 2 Wn. App. 2d 381, 386, 409 P.3d 1184 (2018) ("[U]nchallenged conclusions of law become law of the case.").  And while Citizens states in its briefing that it is challenging findings of fact 19, 45, 55, 119, 132-34, 137, 139, 141, 144, 151, 153-4, and 156 and conclusions of law 6, 8, 25-26, 28-29, 32, 34-35, 37-38, 56, 57, 58, 61, 62, 67, 68, and 71-74, it does not provide any argument that the challenged findings of fact are unsupported by substantial evidence or that the findings of fact do not adequately support the challenged conclusions of law.  As a result, the assignments of error are waived.

*See Cowiche Canyon Conservancy v. Bosley*, 118 Wn.2d 801, 809, 828 P.2d 549 (1992) (an issue to which a party assigns error but does not argue is waived).

Substantial evidence under RCW 34.05.570(3)(e) is "a sufficient quantity of evidence to persuade a fair-minded person of the truth or correctness of the order." *City of Redmond v. Cent. Puget Sound Growth Mgmt. Hr'gs Bd.*, 116 Wn. App. 48, 54, 65 P.3d 337 (2003). The Board's Decision describes at length the mitigation measures included in the MDNS, an assessment of the Project's impact on wildlife, a noise assessment, a traffic impact analysis, the property's zoning designation, and voluminous testimony of County officials and Lakeside's environmental consultants describing the potential environmental impacts—as well as the possible environmental benefits—of the Project. We have carefully reviewed the record alongside Citizens' arguments and the County's and Lakeside's responses and, as part II.B above shows, we conclude that the Board's Decision affirming the County's issuance of a combined MDNS for both permits is "supported by evidence that is substantial when viewed in light of the whole record before the court." RCW 34.05.570(3)(e). Citizens' contrary argument thus fails.

Lastly, citing RCW 34.05.570(3)(i), Citizens argues that the Board's Decision is arbitrary and capricious. Agencies act in an arbitrary or capricious manner when their action is "willful and unreasoning and taken without regard to the attending facts or circumstances." *Hillis v. Dep't of Ecology*, 131 Wn.2d 373, 383, 932 P.2d 139 (1997). "Where there is room for two opinions, and the agency acted honestly and upon due consideration, this court should not find that an action was arbitrary and capricious, even though this court may have reached the

- 24 -

opposite conclusion." *Port of Seattle v. Pollution Control Hr'gs Bd*., 151 Wn.2d 568, 589, 90 P.3d 659 (2004). Because the Board considered the "attending facts and circumstances" and its Decision is not "willful and unreasoning," we reject Citizens' argument that the Decision is arbitrary or capricious under RCW 34.05.570(3)(i).

III

We now turn to Citizens' arguments under the SMA. Citizens asserts two such arguments. First, Citizens argues "The Project is not compatible with and will degrade the existing rural character of the area" and violates King County Comprehensive Plan Policy S-507. That policy states: "King County shall require that the scale and intensity of new uses and development within the High Intensity Environment is compatible with, and protects or enhances, the existing character of the area." The administrative record shows that the site has been used for industrial purposes for nearly a century. Although nearby development is zoned rural, there is commercial and industrial development further to the east and west along SR 169. The asphalt plant will take up less than half of the 25-acre parcel and leave the remainder forested as it is currently. And as conditioned in the County's MDNS, over four acres of the site will be revegetated. The County appropriately considered this evidence in issuing the SSDP.

We similarly affirm the Board's Decision on this issue. The Board's Decision describes the nearby industrial development along SR 169 and notes that most of the site will remain forested. The Board describes this information in findings of fact 51-56. Of these findings, Citizens only assigns error to finding of fact 55. And

even then, it does not provide any argument that finding of fact 55 is unsupported by substantial evidence. As a result, Citizens waived its challenge to finding of fact 55. *See Cowiche Canyon Conservancy* 118 Wn.2d at 809 (an issue to which a party assigns error but does not argue is waived). The Board's findings on this issue are supported by substantial evidence, there is no basis to conclude that it erroneously interpreted or applied the law in affirming the County's SSDP, and its Decision is not arbitrary or capricious.

Second, Citizens argues that the County has not ensured that the Project will not cause a net loss of ecological function in contravention of KCC 21A.25.090(C), KCC 21A.25.080(c)(1), and King County Comprehensive Plan Policy S-601. King County Code 21A.25.090(C) provides, "King County shall ensure that uses and modifications within the shoreline jurisdiction do not cause a net loss of shoreline ecological functions and comply with the sequencing requirements under K.C.C. 21A.25.080." King County Code 21A.25.080(C)(1) provides, "Mitigation shall be designed to . . . [a]chieve no net loss of ecological functions for each new development." And King County Comprehensive Plan Policy S-601 states, "King County shall ensure that new uses, development and redevelopment within the shoreline jurisdiction do not cause a net loss of shoreline ecological processes and functions."

County witnesses testified before the Board that the mitigation measures included in the MDNS would improve ecological functions on-site. Lakeside's environmental consultant Farallon determined that contaminated groundwater is not migrating off the Project site. The above ground storage tanks containing toxic

and hazardous substances will be located on a concrete slab with primary and secondary containment structures in compliance with King County Codes. A spill prevention and response plan will be developed for the site. Stormwater runoff from all impervious areas of the asphalt plant will be collected and directed to the new drainage facility constructed under applicable standards for industrial sites. The County appropriately considered this information in issuing the SSDP.

We similarly affirm the Board's Decision on this issue. The Board's Decision describes the mitigation measures included in the MDNS that would improve ecological functions on-site. The Board considered this information in findings of fact 60-66. Citizens did not challenge any of these findings and, as a result, they are verities on appeal. *Grocery Mfrs. Ass'n*, 198 Wn.2d at 901 ("Since GMA did not challenge this finding, it is a verity on appeal."). The Board's findings on this issue are supported by substantial evidence, there is no basis to conclude that it erroneously interpreted or applied the law in affirming the County's SSDP, and its Decision is not arbitrary or capricious.

Affirmed.

Feldman, J.

WE CONCUR:

Hazelrigg, ACJ

Mann, J.